IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA COVINGTON, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIV. A. NO. H-13-3300 |
| | § | |
| JEFFREY COVINGTON, JUSTIN | § | |
| BARHAM, JEREMY KIDD, | § | |
| CITY OF MADISONVILLE, TEXAS, | § | |
| MADISON COUNTY, TEXAS, THE | § | |
| MADISONVILLE POLICE DEPARTMENT, | § | |
| MADISON COUNTY DISTRICT | § | |
| ATTORNEY, AND MADISON COUNTY | § | |
| DISTRICT ATTORNEY'S OFFICE, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

The above referenced cause, grounded in 42 U.S.C. § 1983, alleges wrongful arrest and seizure of Plaintiff Laura Covington ("Covington") by a Trooper of the Texas Department of Public Safety in violation of the Fourth and Fourteenth Amendments and criminal conduct by two City Police officers, one of whom was Covington's former husband, constituting cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution, negligence in hiring and failure to adequately train and supervise police officers, along with state-law claims of malicious prosecution, false arrest, and intentional infliction of emotional distress. Pending before the Court is Defendant City of Madisonville, Texas's ("the City's") motion to dismiss the claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6) (instrument #57).

**Which Causes of Action Against Which Defendants**

Defendants Madison County, Texas (in #39, 41) and Madison County District Attorney's Office" (in #50-1 and 72, duplicates of First Amended Complaint) have been voluntarily dismissed from this suit.

Jeffrey Covington (officer of and chief narcotics investigator for the Madisonville Police Department), Justin Barham ("Barham")(a police officer who became a lead investigator of narcotics and organized crime for the Madison County District Attorney's Office), and Jeremy Kidd ("Kidd")(an "agent" for officers of the Madisonville Police Department)[1] have been sued in their individual and official capacities. Jeffrey Covington and Barham have appeared, but Kidd, although served on December 26, 2013, more than a year and six months ago (#27 in his individual capacity; #28, in his official capacity), has not appeared and according to the service affidavit is incarcerated in the Texas Department of Criminal Justice, Bartlett Unit. Nevertheless Covington has not moved to voluntarily dismiss Kidd or for entry of default against Kidd. Against the three individual Defendants, Jeffrey Covington, Barham, and Kidd, Covington asserts claims for unlawful seizure in violation of Covington's Fourth and Fourteenth

---

[1] The complaint states that Kidd "was not officially a confidential informant, but was recruited through an official confidential informant, Joyce Hall, to assist."  #72, ¶ 31.

Amendment rights and cruel and unusual punishment in violation of her Eighth Amendment rights.  In addition, against Kidd only and only in his individual capacity, Covington asserts state-law claims for malicious prosecution, false imprisonment, assault, and intentional infliction of emotional distress.

As will be discussed, the claims against these men in their official capacities are claims against the City.  In addition, against the City and the Chief of Police, who is not named as a Defendant, Covington sues for negligent hiring and failure to train and adequately supervise their police officers, with deliberate indifference, under § 1983.

### Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides, "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).  The plaintiff's legal conclusions are not entitled to the same assumption. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions."), *citing Bell Atlantic Corp. v. Twombly*, 556 U.S. 662, 678 (2007); *Hinojosa v. U.S. Bureau of Prisons*, 506 Fed. Appx. 280, 283 (5th Cir. Jan. 7, 2012).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*,556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191,

205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974). "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556. Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

In *Ashcroft v. Iqbal*, 556 U.S. at 679, the Supreme Court stated that "only a complaint that states a plausible claim for relief survives a motion to dismiss," a determination involving "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b). *Iqbal*, 129 S. Ct. at 1949. The plaintiff must plead specific facts, not merely conclusory allegations, to avoid dismissal. *Collins v. Morgan*

*Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

As noted, on a Rule 12(b)(6) review, although generally the court may not look beyond the pleadings, the Court may examine the complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010), *citing Collins*, 224 F.3d at 498-99; *Cinel v. Connick*, 15 F.3d 1338, 1341, 1343 n.6 (5th Cir. 1994). *See also United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003)("the court may consider . . . matters of which judicial notice may be taken"). Taking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) review and does not transform the motion into one for summary judgment. *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of

accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. *Great Plains Trust Co v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)("District courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004)("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion. [citations omitted]"). The court should deny leave to amend if it determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face . . . ." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Proc.* § 1487 (2d ed. 1990).

**Factual Allegations of the First Amended Complaint (#72)**[2]

Plaintiff's First Amended Complaint, the governing pleading, recites a series of wrongful acts by allegedly conspiring Officers Jeffrey Covington and Justin Barham of the Madisonville Police Department and Jeffrey Kidd, an "agent" of these officers, purportedly arising out of and because of Covington's rocky relationship and child custody dispute with her ex-husband, Defendant Jeffrey Covington.

Plaintiff Laura Covington and Defendant Jeffrey Covington were married in 2003, had two children, and were divorced in April or May 2010, with Laura Covington awarded custody of the children. Immediately Covington claims she heard rumors that her ex-husband was plotting with Barham to have someone plant drugs on her so that she would be arrested and Jeffrey Covington could gain custody of the children.

According to the First Amended Complaint, Jeffrey Covington and Barham in their capacities as police officers had summoned a local criminal, Kidd, to a location regularly used by the two officers to set up confidential drug buys with informants, and they plotted together to have drugs planted in Laura Covington's vehicle and then have her stopped, searched, and arrested for possession of controlled substances. Kidd then

---

[2] Deemed filed as of August 26, 2014, before the instant motion, which was filed on September 4, 2014.

planted methamphetamine in a magnetic key holder on Plaintiff's vehicle.  Laura Covington alleges that on August 22, 2011 Jeffrey Covington and other Defendants first initiated what turned out to be an unsuccessful stop and search of Laura Covington's vehicle by having Barham tell Bobby Adams, an investigator with the District Attorney's office, that Barham had information that there were narcotics in the seat rail of Laura Covington's car.  Informed that she would usually drop her children off at school and then go to a particular McDonald's for breakfast, Barham and Adams, in separate vehicles but in radio contact, waited for her near the McDonald's.  Adams radioed to Barham that Laura Covington was speeding.  Although Adams' role as an investigator did not usually involve traffic stops, because Barham told Adams that "it would not look good if someone from the police department pulled her over," Adams stopped Covington and searched her car, but did not find any narcotics or other evidence of illegal activity.

The complaint alleges that Defendants continued to attempt, but failed, to stop, search, and find Laura Covington in possession of drugs up to November 9, 2011, when Trooper Carl Clary ("Clary") of the Texas Department of Public Safety stopped Covington for an alleged traffic offense.  Although Clary did not intend to search the vehicle or issue a citation, when he relayed her name and driver's license over the radio, Jeffrey Covington overheard the report, called Clary, and told Clary that Laura

Covington had drugs and that she had tried to run over Jeffrey
Covington's new wife while dropping off the children at school
that morning.   Clary had also been told two months earlier by
Jeffrey Covington that Laura Covington was known to carry
methamphetamine in a magnetic key holder in her car.   Therefore
Clary chose to search Covington's vehicle.   He later testified
under oath that he would not have done so if Jeffrey Covington had
not called him.   Plaintiff consented to the search, and Clary
found a small amount of methamphetamine where Jeffrey Covington
had told him to look.   Covington was arrested and later charged
with possession of a controlled substance and booked into the
Madison County Jail.   Within a couple of days Jeffrey Covington
filed an emergency *ex parte* petition to remove his two children
from Plaintiff's custody on the grounds that she was a drug user
or dealer and that the children were in danger of immediate harm.
The petition was granted by the judge of the 12th Judicial Court
of Madison County, Texas.

On December 14, 2011 a hearing was held, during which
Jeffrey Covington admitted that he had been terminated from a
former security position in Iraq for conduct that violated his
employer's drug policies.   Clary testified at the hearing and
later during the criminal trial of Jeffrey Covington that Clary
believed the drugs had been in Covington's vehicle for a while,
that Covington and her mother had said they "knew something like

this was going to happen," and that Jeffrey Covington had told Clary two months before exactly where he could find the drugs in Covington's vehicle.  Clary also stated that he did not know who owned the drugs because he could not find any paraphernalia with them, and that usually when he found drugs in a vehicle, they were everywhere, while those in Covington's car were just beneath the door.  The complaint asserts that at Jeffrey Covington's criminal trial an Officer Lowrenz testified that everyone in the Police Department knew about the attempts to stop Laura Covington and find drugs, that Jeffrey Covington and Barham had told Lowrenz himself that Plaintiff was carrying drugs, but that Lowrenz did not stop and search her because he did not want to get involved. Covington also submitted a sample of her hair for testing that revealed she had no drugs in her system.  On January 31, 2013, Assistant Attorney General David Glickler formally dismissed all charges related to Laura Covington's November 9, 2011 arrest.  Her two children were subsequently returned to her custody.

At some point Jeffrey Covington wrote a letter of recommendation in support of Barham in his application to be a lead investigator of organized crime with the Madison County District Attorney's Office. The letter was inappropriate.  For example, he praised Barham's sense of humor as follows:  "Some days he would come in with his pink tutu on yelling random threats and profanities while waving his gun around and then pass out from

all of the drugs and alcohol.  Yep, he is a great time!"  Chief of Police Clandenine,[3] whose "custom [it was] to sign off on everything done by Defendant Covington," sent a more appropriate recommendation.

The complaint asserts that the Texas Rangers joined in on the investigation of Jeffrey Covington and Barham and learned about the two officers' recruitment of Kidd for their scheme to frame Covington.  The Attorney General's Office of the State of Texas became involved in the investigation in February 2013. Jeffrey Covington was subsequently indicted and arrested for delivery of a controlled substance, obstruction/retaliation, and official oppression.  On April 25, 2014 he was found guilty by a jury and convicted of retaliation.  That same month Barham was indicted and arrested on identical charges.  He entered into a plea agreement after Jeffrey Covington's trial.

Asserting that the Chief of Police was the final policymaker for the City, but without any citation to authority or factual support, Laura Covington claims that during the employment of Jeffrey Covington and Barham by the City and Madison County, the two officers had unrestricted and unsupervised freedom to do whatever they wanted to bring about drug arrests in their daily

---

[3] Also referred to and spelled "Gary Clendennen."  #72 at ¶ 113.  The complaint refers to another Chief of Police named May.  The complaint does not indicate when each man served as Madisonville's Chief.

activities and they were not subject to review by any other city official.[4]  The City allegedly failed to do a routine background check on Jeffrey Covington to investigate his discharge from employment in Iraq for drug-related activity.  Covington alleges that Barham was on probation for stealing drug evidence from a crime scene during the relevant time period, but was allowed to continue working under Jeffrey Covington's authority and/or his co-director of confidential informants and/or narcotics.  The City also purportedly had a history of failing adequately to supervise its officers.   The complaint asserts that roughly 60% of the police force either resigned or were terminated for misconduct between September 2011 through March 2013.  Covington claims that the conspiracy[5] among the Defendants and their intentional and malicious acts caused her to suffer legally cognizable injuries and damages, including attorney's fees for her criminal defense and in litigating against the removal of her children.   The complaint (#72) conclusorily alleges,

_____

[4] The complaint does state that they "were only required to run CI operations through the Chief if they needed approval to pay the CIs, which they never needed."   #72 at ¶ 110.

[5] Although the First Amended Complaint does not list conspiracy separately under the Causes of Action section, she alleges through the complaint that the individual Defendants conspired to frame Covington.  To prevail on a § 1983 conspiracy claim, Covington must allege facts that demonstrate and prove (1) the existence of a conspiracy that involves state action and (2) a deprivation of civil rights in furtherance of that conspiracy. *Thompson v. Johnson*, 348 Fed. Appx. 919, 922 (5th Cir. 2009).  The First Amended Complaint does so here.

112.   The Chief of Police, as the final policymaker with respect to the police force of Madisonville, was aware of the activities and created an atmosphere that fostered gross and unchecked misconduct.   The Chief of Police was aware of the specific actions complained of herein, ratified them, or turned a blind eye, allowing them to continue.

113.   The Chief of Police was specifically informed by David Sims, then a police officer with the City, that CIs had come to him and reported that [Jeffrey] Covington and Barham were going around looking for someone to plant drugs in Plaintiff's car in order to frame her.   The Chief brushed this information aside and ignored it.   Former Chief of Police Gary Clendennen was also aware of Defendant Covington's ongoing dispute with his ex-wife over custody and/or his child support obligations.   Clendennen knew or should have known of the efforts of Defendant sergeant Covington to set Plaintiff up to be arrested and prosecuted because of the dispute. Everybody at the police department (if not the entire law enforcement community) knew about Defendant Covington's battle with his ex-wife, and his efforts to conspire to have Plaintiff wrongfully arrested and prosecuted. Moreover, other officers reported the actions of Defendant Covington and/or Barham to the Chief.

114.   Like his predecessor, Chief May allowed Defendant Covington to operate and run the police department with little or no supervision, allowed or delegated to Covington the authority to manage the confidential informants without any supervision or oversight, or even standard operating procedures.   Defendant Covington operated autonomously and was in charge of confidential information as well as the officers under his supervision.   Defendant Covington was a sergeant, chief narcotics officer, and was not required to report to anyone at least with regards to CIs and various investigative activities, was the

supervisor for most if not all of the police officers, and was allowed to make policy with respect to CIs and investigations using CIs.

## Substantive Law

Title 42 U.S.C. § 1983 does not grant substantive rights, but provides a vehicle for a plaintiff to vindicate rights protected by the United States Constitution and other federal laws. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). It provides a cause of action for individuals who have been "depriv[ed] of [their] rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting under color of state law. *Id.*

The Eighth Amendment was designed to bar cruel and unusual punishment against those convicted of a crime; it only applies in criminal actions following a conviction. *Ingraham v. Wright*, 430 U.S. 651, 667 (1977); *John Corp. v. City of Houston*, 214 F.3d 573, 580 (5th Cir. 2000); *Palermo v. Rorex*, 806 F.2d 1266, 1271 (5th Cir. 1987), *cert. denied*, 484 U.S. 819 (1987). Thus it is inapplicable here and Covington's claims under the Eighth Amendment must be dismissed.

Pretrial deprivations of liberty, excessive force, seizure of a free citizen, and arrest with out probable cause fall under the Fourth Amendment and are not cognizable under the Fourteenth Amendment. *Albright v. Oliver*, 510 U.S. 266, 274-75 (1994); *Graham v. Conner*, 490 U.S. 386, 395 (1989). "'[A]ll

claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizens should be analyzed under the Fourth Amendment and its 'reasonableness' standard.'" *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 487 (5th Cir. 2001), *quoting Graham v. Conner*, 490 U.S. at 395 (emphasis in original). Thus Covington's claims under the Fourteenth Amendment must be dismissed as a matter of law.

Municipalities and other bodies of local government are "persons" within the meaning of § 1983. *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). Generally municipalities or local government units are not liable for the constitutional torts of their employees unless those employees act pursuant to an official action or with approval. *Monell*, 436 U.S. at 663 n.7. "A municipality cannot be held liable *solely* because it employs a tortfeasor--or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. A municipality may be liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his constitutional rights. *Monell*, 436 U.S. at 690-91.

To state a claim for municipal liability under Section 1983, a plaintiff must identify (a) a policy maker, (b) an official policy, and (c) a violation of constitutional rights whose "moving force" is the policy or custom. *Piotrowski v. City*

*of Houston*, 237 F.3d 567, (5th Cir. 2001), *citing Monell*, 436 U.S. at 694.

The Fifth Circuit has defined an official policy for purposes of § 1983 as "'[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's law-making officials or by an official to whom the lawmakers have delegated policy-making authority.'" *Okon v. Harris County Hospital District*, 426 App'x 312, 316 (5th Cir. May 23, 2011), *quoting Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984)(*en banc*). Alternatively a policy may be "'a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" *Id., citing id.*, and *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010)("A pattern of conduct is necessary only when the municipal actors are *not* policymakers")[, *cert. denied*, 131 S. Ct. 3059 (2011)]. "Allegations of an isolated incident are not sufficient to show the existence of a custom or policy." *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992). "The unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Id.*

- 17 -

A municipality's policy of inaction in the face of awareness, constructive or actual, that its policy will cause a constitutional violation "'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011), *citing City of Canton, Ohio v. Harris*, 489 U.S. 378, 395 (1989).

"The governing body of the municipality or an official to whom that body has delegated policy-making authority must have actual or constructive knowledge of such a custom." *Okon*, 426 Fed. Appx. at 316, *citing Bennett*, 735 F.2d at 862. "'Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information,'" while "constructive knowledge 'may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.'" *Id., citing Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 18984)(*en banc*).

A policymaker establishes goals relating to a specific municipal function and the means to reach those goals. *Zarnow v. City of Wichita Falls, Texas*, 614 F.3d 161, 167 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 3059 (2011). When a policymaker commits the act at issue, that act may establish the policy if the

policymaker is "unconstrained by policies imposed from a higher authority." *Okon*, 426 Fed. Appx. at 316, *citing Hampton Co. v. Nat'l Sur. LLC v. Tunica County*, 543 F.2d 221, 227 (5th Cir. 2008). The court must determine which official or government body has final policymaking authority for the local government unit regarding the action in dispute. *Id.* Whether a city official is a policymaker is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 134 (1988); *Pembauer v. City of Cincinnati*, 475 U.S. 469, 483 (1986). In Texas a policymaker is one to whom the governing body of the municipality has delegated policy-making authority and who has "the responsibility for making law or setting policy in any given area of a local government's business." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)(*en banc*). "The delegation of policymaking authority requires more than a showing of mere discretion or decision making authority on the part of the official." *Bennett v. City of Slidell*, 728 F.2d at 769. "The official must also be responsible for establishing final governmental policy respecting such activity before the municipality can be held liable." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1996). A single formal decision or a single unconstitutional act by a policymaker can constitute a policy or custom and impose liability on a municipality. *Id.* at 483 (holding that "municipal liability under § 1983 attaches where--and only where--a deliberate choice to

follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."); *Webster*, 735 F.3d at 841; *Zarnow*, 614 F.3d at 169.  Policymakers "are not supervised except as to the totality of their performance." *Id.* The Fifth Circuit has held that a city police chief may be a final policymaker for the purpose of § 1983 liability if the plaintiff shows that the police chief is the only "official responsible for internal policy and where no other municipal officials comment authoritatively on the internal procedures of the department." *Zarnow v. City of Wichita Falls, Texas*, 614 F.3d 161, 168 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 3059 (2011).[6]

--------

[6] In *Zarnow*, 614 F.3d at 168, the Fifth Circuit refines the definition of a policymaker for purpose of § 1983 liability:

> The nature of the administrative oversight is important in determining "policymaker" status.  An official may be a policymaker even if a separate governing body retains some powers.  *See Bennett*, 728 F.2d at 769.  An official may be termed a "policymaker" even if the municipality retains "the prerogative of the purse and final legal control by which it may limit or revoke the authority of the official." *Id.* Further, the subject matter of the administrative review must be precise in order to attach the presumption against policymaking. *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 603 (5th Cir. 2001). "The mere existence of oversight, however, is not enough; the oversight must pertain to the area of authority in question." *Id.* (citation omitted).
>
> Although the City offered evidence that

"Deliberate indifference" is a "stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," for which "[a] showing of simple or even heightened negligence will not suffice"; it requires a plaintiff to show that "'in the light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Valle v. City of Houston*,

---

the City Council periodically authorized the creation of various police task forces, those resolutions have little to do with police policy. There is no evidence that the City Council ever commented authoritatively on the internal procedures of the department. Consequently the administrative review process in place here does not conclusively demonstrate that Chief Coughlin is not a policymaker.

Still, we have maintained that "neither complete discretionary authority nor the unreviewability of such authority automatically results in municipal liability. There must be more." *Bolton v. City of Dallas, Texas*, 541 F.3d 545, 551 (5th Cir. 2008). We agree with the district court that the General Orders promulgated by the police chief sufficed to be the "more" that is needed to prove policymaking authority in these circumstances. On this evidence, the chief of police is the sole official responsible for internal police policy. Others have only marginal involvement with the internal procedures of the police force. . . .

613 F.3d 536, 547 (5th Cir. 2010)(*quoting City of Canton*, 489 U.S. at 390), *cert. denied*, 131 S. Ct. 2094 (2011).  "Usually a plaintiff must show a pattern of similar violations, and in the case of an excessive force claim . . . the prior act must have involved injury to a third party." *Id.; Rodriguez v. Avita*, 871 F.2d 552, 554-55 (5th Cir. 1959).  "[A] single incident of an alleged constitutional violation resulting from the policy may serve as a basis for liability so long as that violation was an obvious consequence of the policy. . . . [A] pattern of misconduct is not required to establish obviousness or notice to the policymaker of the likely consequences of his decision." *Brown v. Bryan County, OK.*, 219 F.3d 450, 460 (5th Cir. 2000), *citing City of Canton*, 489 U.S. at 396 ("Where a section 1983 plaintiff can establish that the facts available to city policymakers that put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of constitutional rights of their citizens, the dictates of *Monell* are satisfied.").  This exception to a pattern of misconduct is "narrow" and requires evidence that "the *highly* predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010).

Ratification can also be a basis for governmental immunity when an authorized policymaker affirms that in performing the challenged conduct, the employee was executing official policy. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)("[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.  If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.").  Whether a governmental decision maker has final policymaking authority is a question of law. *Pembauer v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  "It has long been recognized that, in Texas, the county sheriff is the county's final policy maker in the areas of law enforcement, not by virtue of delegation by the county's governing body, but, rather, by virtue of the office to which the sheriff has been elected." *Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990)(*citing Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980))(*citing Monell*, 436 U.S. at 694), *cert. denied*, 498 U.S. 1069 (1991); *Bennett v. Pippin*, 74 F.3d 578, 586 (1996), *cert. denied*, 519 U.S. 817 (1996).

Laura Covington claims that the City is liable for "negligent hiring" and inadequate police training and supervision.

#72 at p. 19.  "Negligent training will not support a § 1983 claim against a municipality, nor is it sufficient to show that 'injury of accident could have been avoided if an officer had better or more training'" because the statute requires that for liability "for the failure to take precautions to prevent harm must be an intentional choice and not merely a negligent oversight." *Boston v. Harris County, Texas,* No. Civ. A. H-11-1566, 2014  WL 1275921, at *90 (S.D. Tex. March 26, 2014), *citing City of Canton*, 489 U.S. at 390.   For the same reason it would be true of a claim for negligent hiring.   The Court will presume that Covington's use of "negligent" was in error.

          To hold a municipality liable for inadequate hiring, training, and supervision policies, the plaintiff must prove culpability  and causation, i.e., that (1) the municipality's policy was adopted with deliberate or conscious indifference to its known or obvious consequences to the rights of people with whom the police come in contact and (2) the municipality must be the "moving force" behind the constitutional violation. *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998), *cert. granted*, 525 U.S. 1098 (1888), *cert. dismissed*, 526 U.S. 1083 (1999).  "'Only where adequate scrutiny of an applicant's background would lead a reasonable  policymaker  to  conclude  that  the  plainly  obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected rights can the

official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'"" *Id.* at 797, *citing Brown*, 520 U.S. at 411.  The Fifth Circuit observed that in *Brown*, "The court held that the county was not liable for a tort committed by a police officer even though the sheriff had hired the officer despite a lengthy criminal record, including assault and battery, resisting arrest, and public drunkenness.  The Court concluded that '[t]he connection between the background of the particular applicant and the specific constitutional violation must be strong.'"  *Snyder*, 142 F.3d at 797.

　　To prevail on a failure to train theory, a plaintiff must show (1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violation of federally protected rights.  *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009).  *See also Okon*, 426 Fed. Appx. at 316 (the plaintiff must show that "(1) the municipality had a policy or custom of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation was the 'moving force behind the policy or custom.").  A plaintiff may address deficiencies in the particular procedures used to train the municipality's officers, the officers' qualifications, or particular inadequacies with

regard to a specific area of law enforcement, e.g., Fourth Amendment training. *Zarnow*, 614 F.3d at 170.

"[T]here are limited circumstances in which an allegation of failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). Deliberate indifference for a failure to train requires the plaintiff to prove that the city policymaker disregarded "'known or obvious consequence of his action,' and that a particular omission in their training program would cause city employees to violate citizens' constitutional rights." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). "[W]hen city policy makers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' rights, the city may be deemed deliberately indifferent if the policy makers choose to retain that program. The city's 'policy of inaction' in light of notice that its program will cause constitutional violation 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Id.* at 1360, *citing Canton*, 489 U.S. at 395. Moreover municipal liability can only be imposed "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury. . . ." *Monell,* 436 U.S. at 694. To prevail on

- 26 -

a failure to train claim under § 1983, the plaintiff must show specific inadequacies within the training program and that the inadequate training represents city policy. *Id.; see also Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)(To impose liability, the plaintiff must allege with specificity how a particular program is defective.).

"[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* A municipality may be liable for the failure of a policymaker to take precautions to prevent harm, provided that the omission is an intentional choice and not merely a negligent oversight. *Id.* As noted, negligent training will not support a § 1983 claim against a municipality; nor is it sufficient to show that "injury or accident could have been avoided if an officer had better or more training." *Id.* Moreover the plaintiff must demonstrate that "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.*

The real party in interest in a suit against a person in his official capacity is the governmental entity and not the named official. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). *See also*

*Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which the officer is an agent.'"), *citing Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n.55 (1978).   Thus claims against the individual employees of Madisonville, Texas in their official capacities (Jeffrey Covington and Barham) are duplicative of the claims against the City and should be dismissed.  *Kentucky v. Graham*, 473 U.S. 159, 167 (1985).

A private actor may act "under color of state law" within the meaning of § 1983 if "he is a willful participant in joint action with the state or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980); *in accord Brummett v. Camble*, 946 F.2d 1178, 1185 (5th Cir. 1991)("this is true even if the private defendants are alleged to have conspired with one who has absolute, as opposed to qualified, immunity."), *cert. denied*, 514 U.S. 965 (1992).  *See also United States v. Price,* 383 U.S. 787 (1966)("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [§ 1983].   To act 'under color' of law does not require that the accused be an officer of the State.   It is enough that he is a willful participant in joint activity with the State or its agents."); *Hooks v. Hooks,* 771 F.2d 935, 943 (6th Cir.1985) ("Private persons jointly engaged with state officials in a

deprivation of civil rights are acting under color of law for purposes of § 1983."); *Hanania v. Loren–Maltese,* 212 F.3d 353, 356 (7th Cir.2000)(A private actor . . . can have acted under color of law if the plaintiff can establish that "(1) the private individual and a state official reached an understanding to deprive the plaintiff of her constitutional rights and (2) the private individual was a willful participant in joint activity with the state or its agents.").[7] Therefore, under this principle, the § 1983 claim against Kidd is dependent on the validity of the claim against his co-conspirator police officers, Jeffrey Covington and Barham. *See Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007).

State law where the district court sits determines whether a police department has the capacity to sue or be sued. *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313 (5th Cir. 1999)(Under Texas law a city is "allowed to designate whether one of its own subdivisions can be sued as an independent entity."); *Crull v. City of New Braunsfels, Tex.*, 267 Fed. Appx. 338, 341 (5th Cir. 2008)("Unless the political entity that created the [police] department has taken

---

[7] Covington cites no authority, and the Court knows of none, supporting her claim that a confidential informant recommended by another confidential informant is the agent of a municipality is liable for purposes of § 1983 merely because the police used his information and/or services.

- 29 -

'explicit steps to grant the servient agency with jural authority,' the department lacks the authority to sue or be sued."); *Combs v. City of Dallas*, 289 Fed. Appx. 684, 686 (5th Cir. 2008)(per curiam)(dismissing Dallas Police Department from suit "because it is a servient political department that does not enjoy a separate and distinct legal existence from the City of Dallas").  "In order for a plaintiff to sue a city department, it must enjoy a separate legal existence" from the city. *Darby*, 939 F.2d at 313.  A police department usually is not a legal entity separate from the municipality it serves. *Jathanna v. Spring Branch Indep. Sch. Dist.*, Civ. A. No. H-12-1047, 2014 WL 6096675, at *3 (S.D. Tex. Dec. 7, 2013)(citing cases).  Texas Local Gov't Code Ann. § 341.003 ("A home-rule municipality may provide for a police department.") grants all authority to a home-rule municipality to organize a police force. *Darby*, 939 F.2d at 313.  A Texas city therefore is permitted to decide whether one of its own subdivisions can be sued as an independent entity; without such authorization, a police department cannot be sued.  *Id.* Because the police department lacks the legal capacity to be sued separately, but is merely a department of the City, claims against the police department are duplicative of claims against the City and should be

dismissed. *Darby*, 939 F.2d at 313. *See also Buckley v. Dallas County*, No. Civ. A. 3:97-CV-1649-G, 1999 W.L. 222380, at *2 (N.D. Tex. Apr. 13. 1999). Thus Covington's claims against the City's Police Department are claims against the City.

The State of Texas has sovereign immunity and its municipalities and political subdivisions have governmental immunity from claims for damages except where the Legislature waived that immunity in the Texas Tort Claims Act ("TTCA"). *Humphreys v. City of Ganado, Texas*, 467 Fed. Appx. 252, 256 (5th Cir. Mar. 26, 2012), *citing* Tex. Civ. Prac. & Rem. Code § 101.021, and *Reata Constr. Corp. v. City of Dallas*, 197 S.W. 3d 371, 374-76 (Tex. 2006). The terms "sovereign immunity" and "governmental immunity" are not synonymous; "sovereign immunity relates to the State of Texas' immunity from suit and liability," while "governmental immunity" protects cities, counties, school districts and other political subdivisions from suit and liability. *Cunningham v. City of Balch Springs*, No. 3:14-CV-59-L, 2014 WL 4851576, at *6 (N.D. Tex. Sept. 30, 2014), *citing Wichita Falls State Hosp. v. Taylor*, 106 S.W. 3d 692, 694 n.3 (Tex. 2003). The Texas Legislature's limited waiver of sovereign immunity is for tort claims arising out of the use of publicly owned automobiles, for premises defects, and for injuries arising out of conditions or use of property. Tex. Civ. Prac. & Rem. Code §

101.021.  It does not waive immunity for intentional torts, such as assault and battery, malicious prosecution, false arrest, or intentional infliction of emotional distress.  *See, e.g., Muhammad v. Newell*, 3-08-CV-1426-BD, 2009 WL 2482142, at *3 (N.D. Tex. Aug. 12, 2009)(limited waiver of TTCA "does not extend to claims 'arising out of assault, battery, false imprisonment, or any other intentional tort"); *Chalmers*, 2014 WL 1778946, at *4 (false imprisonment).  Thus should Covington be bringing any the state-law intentional tort claims (false arrest, malicious prosecution, and intentional infliction of emotional distress) against Jeremy Kidd in his official capacity that might redound to the City for liability based on his alleged conspiracy with Jeffrey Covington and Barham or Covington's proposed "agent" theory, they are barred by governmental immunity.  *Carter v. Diamon URS Huntsville, LL*, No. Civ. A. H-14-2776, 2015 WL 3629793, at *11-12 (S.D. Tex. June 10, 2015).  Nevertheless, because the claims against Kidd in his individual capacity do not involve the City nor implicate its liability, they are not relevant to the City's motion to dismiss.

### The City's Motion to Dismiss (#57)

The City first points out that Covington cannot support a claim against any Defendant under the Eighth or Fourteenth Amendments because she was not serving a sentence for which she had been convicted at the time of the alleged constitutional deprivations.  Covington's claims may only fall under the Fourth

Amendment since she was a free citizen at the time she was seized and that she was never convicted.  Covington has no cognizable claim of unlawful arrest under the Fourteenth Amendment.  "The Framers [of the Constitution] considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." *Albright v. Oliver*, 510 U.S. at 275.  As indicated *supra*, the Court section concurs, as discussed in the Substantive Law of this Opinion and Order.

The City next notes that Plaintiff's claims against the individual Defendants in their official capacities are claims against official's office and no different than a suit against the governmental unit which employs him, here the City.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). "Official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . . ." *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Thus for these claims Covington must meet the standard for prevailing on claims against governmental entities and governmental defenses.  Because the claims against the individual Defendants in their official capacities are duplicative of the claims against the City, they should be dismissed. *Kentucky v. Graham*, 473 U.S. 159, 167 (1985).  The City states that "to the extent that Covington seeks to impose liability upon claims against any individual defendant in a

claimed official capacity that imputes liability upon the City, such claims must be treated as claims against the City." #57 at p. 5 n.2. As indicated *supra*, the Court agrees with the City as a matter of law.

Third, the City contends that Plaintiff's claim against the City's Police Department is also a claim against the City under Texas law because the Police Department has no separate jural existence from the City, so it must be dismissed as a defendant. The Police Department is merely a department of the City and claims against it are duplicative of those against the City and should be dismissed. *Darby v. City of Pasadena*, 939 F.2d 311, 313 (5th Cir. 1991)("The Texas Code grants all authority to organize a police force to the city itself. Tex. Local Gov't Code Ann. § 341.003."); *Buckley v. Dallas County*, No. Civ. A. 3:97-CV-1649-G, 1999 WL 222380, at *2 *N.D. Tex. Apr. 13, 1999)(citing "federal courts in Texas that have uniformly held that entities without a separate jural existence are not subject to suit"; unless the city "has taken explicit steps to grant the servient agency with jural authority, the agency cannot engage in any litigation except in concert with the government itself.")(*quoting Darby* at 313); *Hutchinson v. Brookshire Bros., Ltd.*, 205 F. Supp. 2d 629, 635-36 (E.D. Tex. 2002). Here, too, as evidenced in the Substantive Law section of this Opinion and Order, the Court agrees with the City's presentation and application of the law.

The City further argues that Covington's claims against it must be dismissed because Plaintiff fails to allege facts that show that the City deprived her of a constitutionally protected right. She fails to allege that the City's policymaker was deliberately indifferent to the need for a constitutionally adequate police supervision or hiring program, or that the City's programs caused Jeffrey Covington, Barham or Kidd to plant drugs on Plaintiff so that she would be arrested and lose custody of her children. *See Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)(To support a claim against the City, a plaintiff must allege facts demonstrating (1) a City policy or custom accepted by the City's policymaker; (2) a connection between the identified alleged policy or custom to the City through its policymaker; and (3) the plaintiff was subjected to constitutional deprivation because of execution of the particular policy or custom identified.); *in accord, Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir.)(*en banc*), *cert. denied*, 472 U.S. 1016 (1985). Furthermore, when a plaintiff seeks to impose municipal liability on the grounds that a facially lawful municipal action has led an employee to violate a plaintiff's rights, the plaintiff must establish that the municipal action was taken with "deliberate indifference" to its known or obvious consequences. *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 407 (1997). "[P]roof of an inadequate policy, without more,

is insufficient to meet the threshold requirements of § 1983." *Gonzalez v. Yselta Indep. Sch. Dist.*, 996 F.2d 7445, 757 (5th Cir. 1983).   For the municipality to be liable, the plaintiff must provide evidence not only of a decision, but of a decision by the city, itself, to violate the Constitution. *Gonzalez*, 996 F.2d at 759.

The City insists that Covington has not met these requirements.   Plaintiff fails to allege facts showing that the City's policymaker, its city council, was deliberately indifferent to the need for a constitutionally adequate police supervision program, or that any implied deficiency even existed.   To demonstrate constitutionally inadequate supervision of the City's police force, Covington must allege facts showing that the City systematically failed to supervise its police officers, that a causal connection existed between that alleged failure to supervise officers and deprivation of Plaintiff's constitutionally protected rights, and that the failure to supervise was effected by a City policymaker through deliberate indifference. *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997).   Plaintiff simply presents a broad conclusion that the City's officers were not adequately supervised.   The City argues that Covington's claim is based on her allegation that nearly one-half of the City's police officers were fired or resigned in a

six-month period, but that fact does not plausibly show a lack of supervision, but the opposite.

Nor does Covington state facts demonstrating that a City policymaker was deliberately indifferent to the need for a constitutionally adequate police officer hiring program, contends the City.  The State of Texas, through the Texas Commission on Law Enforcement ("TCOLE"),[8] has established state-wide standards for the qualification, licensing, and training of law enforcement officers in Texas.  Tex.  Occ.  Code § 1701.251.[9]  These qualifications are more demanding than those minimally required under the Constitution.  *Brown*, 337 F.3d at 541.[10]  The City contends that it cannot have been deliberately indifferent in

---

[8] Formerly known as the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE").

[9] See 37 Tex. Admin. Code § 217.1 (2014), establishing standards for training, certification, and licensing of peace officers in the state of Texas.

[10] The Court notes other courts' recent decisions finding TCOLE or TCLEOSE training a factor, if not a dispositive one, to counter a claim of deliberate indifference in a failure to train case under § 1983 include the following:  *Haywood v. Johnson*, No. A-13-CA-355-SS, 2014 WL 4929311, at *9 (W.D. Tex. Oct. 1, 2014); *Boston v. Harris County, Texas*, 2014 WL 1275921, at *15 & n.12 (S.D. Tex. Mar. 26, 2014), *quoting Zarnow*, 614 F.3d at 171 ("compliance with state requirements is a factor counseling against a 'failure to train"); *Backe v. City of Galveston, Texas*, 2 F. Supp. 3d 988, 1008 (S.D. Tex. 2014)(*quoting Zarnow*); *Echols v. Gardiner*, 2013 WL 6243736, at *12 & n.122(S.D. Tex. Dec. 3, 2013)(granting summary judgment on failure to train claims based on "TCLEOSE standards, which the parties appear to agree are nationally recognized as sufficient"); and *Dudley v. Bexar County*, No. 5:12-CV-357-DAE, 2014 WL 6979542, at *11 (W.D. Tex. Dec. 9, 2014).

relying on the TCOLE standards for hiring qualified officers. Moreover Covington does not address the City's hiring program, but criticizes the City's investigation of the background of a single officer who was employed by a different law enforcement agency in Texas before joining th City's police force. *Brown*, 520 U.S. at 410-11 ("Unlike the risk from a particular glaring omission in a training program, the risk from a single instance of inadequate screening of an applicant's background is not 'obvious' in the abstract; rather it depends on the background of the applicant. A lack of scrutiny may increase the likelihood that an unfit officer will be hired, and that the unfit officer will, when placed in a particular position to affect the rights of citizens, act improperly. The fact that inadequate scrutiny of an applicant's background would make a violation of rights more *likely* cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific violation. After all, a full screening of an applicant's background might reveal no cause for concern at all; if so, a hiring official who failed to scrutinize the applicant's background cannot be said to have consciously disregarded an obvious risk that the officer would subsequently inflict a particular constitutional injury."). The inference that the hiring program deprived Covington of her rights is implausible, based on allegations that a police officer framed his ex-wife to

gain custody of the couple's children.   "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'"  *Brown*, 520 U.S. at 411.

In sum, a finding of culpability cannot rest on the mere possibility or even probability that an inadequately screened officer may inflict a constitutional injury; instead it would have to depend on a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff. . . . The connection between the background of a particular applicant and the specific constitutional violation must be strong."  *Id.* Covington has not alleged any facts that show that a City policymaker implemented a constitutionally deficient hiring program policy, no less that any hiring program established by the City was constitutionally inadequate under *Brown*.

Finally, Covington fails to allege facts showing that the City's policymaker ratified the unconstitutional arrest of Plaintiff.  The principle of ratification, established in *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), is rarely applied. Under it a municipality cannot be held liable under § 1983 on a ratification theory unless the government ratifies the

unconstitutional conduct. *Id.* at 926-28. Before the City can be held liable under this theory, an authorized policymaker must approve of both the subordinate's decision to engage in unlawful conduct and the basis for the decision. *Beattie v. Madison County School Dist.*, 254 F.3d 595, 603 (5th Cir. 2001). Here the City through its policymaker did not approve of the alleged unconstitutional arrest of Covington. It cooperated with the criminal prosecution, discharged Jeffrey Covington based on allegations made in this lawsuit, and Barham had already left the City's employ when the evidence was uncovered. Thus here, too. Covington fails to state a claim for which relief can be granted against the City.

### Covington's Response (#64)

Covington argues that the issue here is whether the Chief of Police is a final policymaker for the City dealing with management of confidential informants and/or if he delegated that authority to Defendants Jeffrey Covington or Barham. The Court finds that this is only one of several issues in this case.

Covington's response largely reiterates the conclusory allegations made in her complaint, which the Court has summarized. She insists that "the Chief of Police, final policymaker for the City, knew of the conspiracy and efforts to violate Plaintiff's civil rights but intentionally disregarded, ratified, protected, and directly allowed deprivation of those rights," "was aware of

the activities and created an atmosphere that fostered gross and
unchecked misconduct," or "turned a blind eye, allowing them to
continue."  Covington points out that she has alleged that Police
officer David Sims told the Chief that CIs had come to him and
reported that Jeffrey Covington and Barham were seeking someone to
plant drugs in Covington's car to frame her, but the Chief ignored
the report.  (So, too, did Covington allege that Officers Clary
and Lowrenz testified that the Chief like everyone else in the
police department, was aware of Jeffrey Covington's ongoing
conflict with his ex-wife.)  In an effort to qualify Jeffrey
Covington as a policymaker, Laura Covington alleges that he
"operated autonomously and was in charge of the supervision of
confidential informants as well as the officers under his
supervision" and "as a sergeant, chief narcotics officer . . . was
not required to report to anyone at least with regards to CIs, and
various investigative activities, was the supervisor for most if
not all the police officers, and was allowed to make policy with
respect to CIs and investigations using CIs."  #64 at p. 12.

As for the City's contention that claims against the
individual Defendants in their official capacities are duplicative
of claims against the City and should be dismissed, Covington
responds that (1) the City's motion for dismissal is against
parties it does not represent and (2) it only applies to a damages
judgment, not to injunctive relief under the principles of *Ex*

*parte Young*, 209 U.S. 123 (1908). *See also Edelman v. Jordan*, 415 U.S. 651, 667-68 (1974). The Court disagrees. The established law is very clear that a suit against an individual in his official governmental capacity is, in essence, a suit against the government entity he serves, and thus the City has every right to move for dismissal of these claims. As for injunctive relief, although Covington may have prayed for it, Jeffrey Covington and Barham are no longer employed by the City, and as discussed below, because Covington fails to state a claim against the City, the request for injunctive relief also fails.

### Court's Ruling

As discussed *supra*, as a matter of law Plaintiff's claims under the Eighth and Fourteenth Amendments are not cognizable and are DISMISSED with prejudice.

Because Laura Covington's claims against Jeffrey Covington and Barham in their official capacities are in actuality claims against the City, these claims against Jeffrey Covington and Barham in their official capacities are also DISMISSED as duplicative. So too, is any claim against Kidd in his official capacity as a co-conspirator of Jeffrey Covington and Barham in state action in violating Covington's federally protected rights hereby DISMISSED.

Nor, the Court finds, does Covington state a plausible claim under § 1983 against the City. The First Amended Complaint

is impermissibly conclusory and vague in key issues.   Although
Covington claims the Chief of Police is the City's final
policymaker, she does not even distinguish between the two  named
in the complaint (Clandenine and May) and who is responsible for
what, she does not allege that either one  personally participated
in the false arrest and malicious prosecution, and she fails to
provide the factual support necessary to establish that status for
the City's Chief of Police.   Instead she alleges only a single
isolated example (the scheme against her by Jeffrey Covington,
Barham, and Kidd), but no other instances to establish a custom or
policy of false arrests and malicious prosecutions, not to mention
a custom or practice of other constitutional violations.
Covington's exaggerated argument that because a final policy maker
will generally be someone whose decisions are not subject to
review by another official or governmental body, Jeffrey Covington
and Barham's alleged (but unsupported) unrestrained freedom to
operate the police department, or at least the CIs, means they
were somehow delegated the role of policymakers for the City, is
both too attenuated to establish such a status and highly
implausible.   Nor does Covington show that the Chief of Police (or
Jeffrey Covington and Barham) "made a deliberate choice to follow
a course of action . . . from various alternatives." *Pembaur*, 475
U.S. at 483-84.   Not only does Covington fail to describe any
other specific incidents of such alleged reckless, unrestricted

behavior by the two to establish a pattern or custom of conduct, but accepting such reasoning would open Pandora's box to claims of policymaker status.

Nor does Covington state a claim for any City policy, custom, or widespread practice of false arrests.

Covington claims the City had a practice of inadequate background checks of applicants for employment because it failed to discover the fact that Jeffrey Covington was fired from a security job in Iraq for violating his employer's drug policy and that Barham was on probation for stealing drug evidence from a crime scene. Again, she cites only these two examples and she fails to show that the City's failure to investigate their backgrounds would lead a reasonable policy maker to conclude that the plainly obvious consequence of hiring them would be the deprivation of a third party's (Laura Covington's) federally protected rights. *Snyder*, 142 F.3d at 795. Nor does she show that the failure to investigate their past histories was the moving force behind the violation of Covington's constitutional rights. The complaint makes clear that the motivating factor was Jeffrey Covington's desire for revenge and obtaining custody of his children.

Regarding her claim of failure to train or supervise the City's police, Covington offers no particulars about the City's training procedures, no less identifies inadequacies or omissions

in them.   Nor does she shown any deficiencies were intentional or established with deliberate indifference.   Nor does she show they were the moving force behind the violation of Covington's rights.

Accordingly, the Court

ORDERS that the City's motion to dismiss the claims asserted against it pursuant to Fed. R. Civ. P. 12(b)(6) is GRANTED, but Covington is GRANTED LEAVE, if she is able, to file within twenty days an amended pleading that satisfies the requirements to state a claim against the City under § 1983 or she shall inform the Court that she no longer wishes to pursue her claims against the City.

Furthermore, Kidd was served on December 26, 2013, more than a year and six months ago, far beyond the twenty-one days permitted for filing a responsive pleading under Fed. R. Civ. P. 12(1)(A).   Kidd has never made an appearance nor filed a responsive pleading, nor has Covington moved for entry of default against him.   Moreover, as noted, Covington's claims of constitutional violations under § 1983 against Kidd (based on his conspiracy with Jeffrey Covington and Barham) are actually duplicative of claims against the City and are dismissed. Therefore the Court

ORDERS that Covington shall file within twenty days either a motion for entry of default, to be followed by a motion for default judgment, or a voluntary dismissal of Kidd, or an

amended pleading that adequately states the state-law tort claims against Kidd in his individual capacity, supported by facts, or the Court will dismiss the state-law tort claims against Kidd for failure to prosecute.

**SIGNED** at Houston, Texas, this  4th  day of  September ,
2015.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

- 46 -