IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA COVINGTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 4:13-CV-03300 |
| | § | |
| JEFFERY COVINGTON, JUSTIN BARHAM, | § | |
| JEREMY KIDD, INDIVIDUALLY AND IN | § | |
| HIS OFFICIAL CAPACITY, THE CITY OF | § | |
| MADISONVILLE, TEXAS, AND THE | § | |
| MADISONVILLE POLICE DEPARTMENT, | § | Jury Demanded |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

COMES NOW, LAURA COVINGTON, the Plaintiff, and who, by and through her undersigned attorneys of record, files with this Honorable Court her Second Amended Complaint and for causes of action would respectfully demonstrate as follows:

**I. PARTIES[1]**

1.      Plaintiff, Laura Covington, is a natural person and resident citizen of Madisonville, Madison County, Texas.

2.      Defendant, Jeffery Covington, is a natural person who has been served with process by serving him at his residence at 4639 Davidson Lane in Madisonville, Texas 77864, and answered.  Defendant Covington has been served in his official capacity by serving City Manager Danny Singletary at Madisonville City Hall, 210 West Cottonwood, Madisonville, Texas 77864, and has answered.

---

[1] Madison County and the Madison County District Attorney's Office have been voluntarily dismissed as defendants from the lawsuit.  Plaintiff's State law claims against Defendants Covington and Barham were previously abandoned in Plaintiff's First Amended Complaint.

3.      Defendant, Justin Barham, is a natural person who has been served with process by serving him at his residence, 8389 Oxford Cemetery Road, Madisonville, Texas 77864, or wherever he may be found.  Defendant Barham has been served in his official capacity as a Madisonville Police officer by serving the City Manager Danny Singletary at Madisonville City Hall, 210 West Cottonwood,  Madisonville, Texas 77864. Defendant Barham has been served in by serving the County Judge Arthur M. Henson at 101 W. Main Street, Suite 110, Madisonville, Texas 77864, and has answered.

4.      Defendant, Jeremy Kidd, is a natural person who may be served with process by serving him at 2007 Echoles Street, Bryan, Texas 77801, or wherever he may be found. Defendant Kidd may be served in his official capacity as an agent (but not employee) of the Madisonville Police Department by serving City Manager Danny Singletary at Madisonville City Hall, 210 West Cottonwood, Madisonville, Texas 77864.  Defendant Kidd has been served but has answered.

5.      Defendant, the City of Madisonville, Texas is a municipal corporation, incorporated under the laws of the State of Texas and located within Madison County, Texas, that has been served and answered in this action.

6.      Defendant, Madisonville Police Department, is the law enforcement agency of the City of Madisonville, Texas, has been served with process by serving City Manager, City Manager Danny Singletary at Madisonville City Hall, 210 West Cottonwood, Madisonville, Texas 77864.

## II. JURISDICTION

7.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §1331, because the claims involve a question of federal law under 42 U.S.C. §1983.  This Court also has pendant

and ancillary jurisdiction over the related state-law claims pursuant to 28 U.S.C. §1367 (a).

### III. VENUE

8.     Venue is appropriate and proper in this cause in the Southern District of Texas pursuant to 28 U.S.C. §1391 (a)(1) as at least one (1) of the Defendants currently resides, or is located within, the Southern District at the time of filing this suit, as well as under 28 U.S.C §1391 (a) (2) because all or a substantial part of the events which gave rise to this cause of action occurred in the Southern District of Texas.

### IV. FACTS

1.     Laura Swinner Covington ("Laura") and Jeffery Allen Covington ("Jeffrey") were first married in 2003.

2.     At the time of their first marriage, Jeffrey was a certified peace officer employed with the City of Madisonville, Texas.

3.     Laura and Jeffrey principally lived with Laura's single mother.

4.     As of 2015, Jeffrey has had four (4) marriages; Jeffrey was married to his first wife in 1999 and had a son by the marriage; the marriage ended in divorce; Jeffrey was not obligated to any child support because he voluntarily relinquished his parental rights before marrying Laura.

5.     Jeffrey and Laura were married twice.

6.     Two children were born from Laura and Jeffrey's marriage: a boy named Parker Covington, born June 16, 2003, and a girl named Paige Covington, born March 24, 2005.

7.     In November or December of 2003, Laura filed for divorce, mainly because she suspected Jeffrey had been unfaithful to her.

8.     In February 2004, Laura and Jeffrey's divorce was finalized; however, Jeffrey and

Laura continued to have a romantic relationship, although they lived separately and each dated other people.

9.      The couple reconciled and in December 2007, while Jeffrey was working overseas in Iraq, and Jeffrey and Laura were remarried during one of Jeffrey's visits to Madisonville, Texas.

10.     On February 8, 2009, Jeffrey was terminated from his employment with a private company, DynCorp International, and returned from overseas to Madisonville, Texas.

11.     After some difficulty finding employment, Jeffrey was hired by Gary "Paco" Clendennen, then Chief of Police for the City of Madisonville.

12.     Gary "Paco" Clendennen, who was the Chief of Police for Madisonville from 2008 through 2011, interviewed and hired Covington beginning July 16, 2009, as a police officer.

**2009 Investigation – Family Violence**

13.     In October of 2009, Laura and Jeffrey were still married and in a relationship, acting as husband and wife, but living separately.

14.     On October 21, 2009, Laura confronted Jeffrey about rumors she had heard about another woman, again, and wanted to see Jeffrey's phone that was locked in the car.   The couple were at Laura's mother's house, where Laura was staying.   Laura was sitting on the couch holding a baseball bat between her knees.   Jeffrey was standing directly in front of her.   Laura went to bring it up as if to hi him but not hit him, and he "snapped," grabbed Laura's throat, threw her on the couch, put his knee in Laura's chest while choking her.

15.     The police were called by both Laura and her brother, Justin Swinner, who was in the house.   Laura's mother witnessed the incident.   The Madisonville Police Department originally responded to the call.   The Chief of Police Clendennen came to the scene, but the Chief

did go to Jeffrey's house afterwards.

16.     Because the complaint involved Jeffrey, the matter was referred to the Texas Ranger Stephen Jeter on October 22, 2009, for criminal Investigation.[2]

17.     By letter dated October 23, 2009, Jeffrey was placed on administrative leave (suspension) with pay pending the outcome of the investigation.  The letter stated:

> As a Police Officer and being involved in "Family Violence", the incident will be initially investigated by the Madisonville Police Department and turned over to the Department of Public Safety, Ranger Steve Jeter out of Huntsville, Texas for follow-up. You were advised on October 21st, 2009 at 11:00 p.m. verbally by me at your residence at 110 Byers to turn over your department issued badge and identification to me and advised at that time you were being placed on administrative suspension with pay and report to my office the following morning.  This letter is to confirm that you understand that you are being placed on administrative suspension with pay at this time until further notice pending the outcome of the investigation. You are not to conduct yourself as a law enforcement officer or carry a firearm during the course of this investigation until a final disposition has been rendered in this case.

18.     Chief Clendennen determined, based on his internal investigation, that there had been no wrongdoing by Jeffrey Covington.

19.     On the written statement of Justin Barham regarding the incident in Jeffrey's personnel, the Chief's handwritten note appears above the sentence "he was able to block it," the Chief's handwritten note appears in red ink, above the circled word "it" - "What did she use this time?"  There were no other incidents or reports of family violence between Laura and Jeffrey, prior or subsequent to the choking incident.

20.     There is no indication of the date Jeffrey's administrative suspension ended in his personnel file.

21.     Texas Ranger Stephen Jeter conducted an investigation of Jeffrey for Assault

---

[2] Texas law, TCOLE rules, and Madisonville Police Department policies, prohibit the appointment of police officers with a charge/conviction involving domestic violence.

causing Bodily Injury – Family Violence, Texas Penal Code § 22.01(a)(f).   Ranger Jeter's report was completed on November 19, 2009, and indicated that the investigation was going to be presented to the Madison County District Attorney.

22.     According to documents in Jeffrey's personnel file, the District Attorney declined prosecution on November 19, 2009.

**Second Divorce**

23.     Jeffrey and Laura's marital problems continued, and in February 2010, the couple initiated divorce proceedings again.   Their second divorce was finalized on May 17, 2010.   Laura was awarded the right to establish the domicile of the two children and the right to receive child support from Jeffrey.

24.     Conflict began almost immediately after the divorce was finalized, when Jeffrey sough a waiver from Laura to allow him to marry another woman within thirty days of their divorce.   This began a contentious and ongoing custody dispute between Laura and Jeffrey that was common knowledge at the Police Department and among local law enforcement.

25.     During the custody battle, Laura began hearing rumors that Jeffrey Covington was going to have someone plant drugs on her so that he could "win" the custody battle.   Laura relayed these rumors to the children's therapist, James Woods located in Bryan, Texas, approximately one week before she was ultimately arrested in this case.

26.     Jeffrey had earlier met and become romantically involved with his next wife, April Covington, at least as of March 2010.   Jeffrey and April Covington were married on May 10, 2010.

**Promotion to Sergeant**

27.     On July 29, 2010, Chief Clendennen promoted Jeffrey to Patrol Sergeant,

meaning that he was supervisor of all of the Patrol Officers, including all investigations.  He was also a Canine officer and in charge of the department's Confidential Informants.

### 2010 Investigation – Injury to a Child

28.     The Second Ranger's Investigation of Jeffrey occurred after he and Laura were divorced the second time, in late 2010.

29.     Laura had custody of the children and lived with her mother.   Jeffrey had married April Covington in May 2010 and they lived together at April's residence.

30.     Paige Covington was kindergarten age, she fell while playing on a trampoline and her leg was broken.  She was taken to the hospital and her leg was in a cast for six (6) weeks. Immediately after the cast was removed, at the end of October – beginning of December, 2010, Paige was at Jeffrey's house, and she was not walking on her own.  She was terrified to walk, would cry.  Dr. Veazy, the orthopedic surgeon, had said that Paige would make those steps when she was ready.  So, Jeffrey used pajama pants to tie Paige's leg and forced her to walk along a wall holding onto a wall.  And there were times when, Paige said, he would not allow her to put her fingertips on the wall.

31.     Paige came home with marks across her bottom, and when Laura asked what had happened, said that her Dad had put the pajama pants around her and made her walk, had made h came home with marks across her bottom, and when she wouldn't walk, that they would spank her. Jeffrey and his new wife, April Covington, had spanked Paige by hand and struck her with a paddle.

32.     Laura took Paige to the doctor, Dr. Hubley, who contacted Child Protective Services (CPS).

33.      Child Protective Services contacted law enforcement, and Ranger Jeter

conducted a second investigation of Jeffrey, related to injury to a child.  The case was presented to a grand jury but no charges were brought against Jeffrey.

34.     This time, Jeffrey was not placed on administrative leave, and no internal investigation was performed by the Madisonville Police Department.

**April's Ultimatum**

35.     Jeffrey Covington's third wife, April, the assistant to the Madison County Judge, felt threatened by Laura and wanted her out of their lives.  April has two children from a prior relationship who lived with April and Jeffrey.

36.     Jeffrey Covington was obligated to pay child support to Laura for their two children, which was automatically deducted from his police officer wages.  Jeffrey had a son by his first marriage, in Bryan, Texas, and had avoided paying child support by voluntarily relinquishing his parental rights after he and the child's mother were divorced.

37.     After the CPS/Rangers investigation in 2010, April told Jeffrey that he was either going to get rid of Laura, even if that meant getting rid of his children with Laura, or April was going to leave him.

38.     April and Jeffrey set out devising a plan to get rid of Laura so as to obtain custody of Laura's children.

39.     Richard Felton was a local businessman who provided services and participated in events at the Madisonville Housing Authority.  Felton had also been the high school boyfriend of April Covington.   April had a position with the Madisonville Housing Authority, and began asking Richard Felton if he knew anyone who could plant drugs on Laura so that April and Jeffrey could get custody of the children.   April had also asked Felton, by Yahoo instant messenger, if he could get his hands on drugs and if it would be possible to set up Laura.

40.     After Laura's arrest, she received a phone call from Richard Felton, who told her about April Covington's requests to get someone to plant drugs on Laura so that April and Jeffrey could get custody of the children.   Laura passed along the information to Ranger Andres De La Garza.  The full details were confirmed by video recorded interviews of Felton by Ranger Andres De La Garza, audio recorded interviews with Assistant Attorney General Glickler and Ranger De La Garza, and by Felton's written statements.   Felton confirmed he had received messages from April. Felton stated April asked if he still had any contacts where he could get his hands on drugs, and if it would be possible to set up Laura Swinner Covington.

41.     As a child, April had reported her father for drug use causing him to be convicted of a crime and imprisoned.  In the process, April had gained substantial public support for her act.

42.     Around the same time, Jeffrey Covington started telling Officer Barham that they needed to get something on Laura and it needed to happen QUICKLY.

43.     Patricia Welch, Director of Madisonville Housing Authority, and Justin Barham had been involved in a personal relationship for some time.  Welch and Barham were watching a move when Jeffrey called and she heard Jeffrey's statements over the phone.  Welch later shared the information with Ranger De La Garza, and testified at the 2014 criminal trial of Jeffrey Covington.

44.     In addition to Richard Felton, Jeffrey and Barham started trying to recruit Confidential Informants and local criminals to plant drugs or other evidence on Laura's vehicle, so he could get custody of his children, including Christopher Toby Smith, James "Jimbo" Richards, and Jeremy Kidd, Shelley Huntley, Coty Simons, among others.  Jeffrey would tell them that once they planted the drugs, he would get local law enforcement to stop and arrest Laura.

45.     Confidential Informants for MPD worked pursuant to a written contract with the MPD, and were unpaid although they could be paid.  The CI's only required approval by the Chief of Police in order to be paid, however, the Madisonville Police Department never paid any CI.

46.     The CI's were obligated to assist in making the arrests and convictions of a negotiated number of suspects (five), in exchange for which they would receive official favors in their criminal charges and/or investigations by the District Attorney.

47.     Jeffrey was the final authority for the MPD in the management of the CI's. Despite learning of reports that Jeffrey was trying to get CIs to plant drugs on his ex-wife, nothing was done. Covington continued to have absolute authority of CIs and narcotics investigations for the Madisonville Police Department and therefore the City.

48.     **On March 1, 2011, Jeremy Kidd plants drugs on Laura Covington's vehicle, provided to him by Joyce Hall**.[3]

49.     Kidd was assured by Covington and Barham that if he did so, they would help him to work off his criminal cases in Madison County.

50.     Kidd planted the dope on Laura Covington's vehicle in March of 2011: underneath the passenger's side or the driver's side door.

---

[3]Both Kidd and Hall later confirmed that the drugs had been planted by March 1, 2011.  Kidd told Ranger De La Garza during a second interview in November 2012, and testified during Covington's criminal trial in April 2014, that he planted the dope on Laura's vehicle in March 2011, which he had received from Joyce Hall.

Hall stated she remembered this because she had met with Investigator LEDESMA the same day to make a deal.   HALL was told by BARHAM the dope was originally missed during a vehicle search because a rookie cop made the search. BARHAM said he watched the traffic stop but did not participate in the search of the vehicle. HALL continued to tell Ranger DE LA GARZA that Jeffrey COVINGTON and BARHAM both had significant interest in Laura SWINNER COVINGTON. HALL also said Jeremy KIDD made Sergeant Jody NAVARRO promise not to tell anybody he planted the dope on Laura's vehicle. According to HALL, Sergeant NAVARRO told Sheena THOMAS to tell Ranger DE LA GARZA about the dope being planted.

51.     Officer Justin Barham had told Kidd on the initial search of the vehicle (after the dope was planted), the officer [Adams] did not find it.

52.     Kidd had previously been a Confidential Information for the District Attorney, but his CI agreement was revoked because he failed to provide any useful information or secure any arrests.

53.     District Attorney Brian Risinger testified that around this time, Barham started asking him about signing Jeremy Kidd up as a Confidential Informant.  (He recalled it was before the August 22, 2011, "failed" search of Laura's car by DISTRICT ATTORNEY Investigator Bobby Adams.)

54.     DA Risinger had told Barham he did not want Jeremy Kidd as a CI.  Barham had asked Risinger, if they signed up Joyce Hall as a CI, whether Kidd—an associate of Hall's— could assist Joyce Hall with her CI contract or information toward her cases.  DA Risinger had said he did not care how Hall got her cases or who helped her, but he did not want Kidd as a CI.

55.     Jeremy Kidd was promised that if he helped frame and secure the arrest of Laura Covington, Barham would be rewarded with a job in a newly created position of authority at the DA's office, and would in turn, use his position at the DA's office to get Jeremy Kidd signed up again as a Confidential Informant.

56.     During his interview by Ranger De La Garza on November 15, 2012, Jeremy Kidd stated that the reason Barham had his job at the Madison County District Attorney's Office was because he (Kidd) helped him plant dope on Laura.

57.     Kidd believed that the only reason the dope was being planted was because Laura used to be married to a cop (Jeffrey), and he was trying to get custody of his children.  Kidd confirmed that that Joyce Hall knew all about the situation between Laura and Jeffrey.   Kidd

explained that he had lied during his first interview with De La Garza, on November 17, 2011, at approximately 2:30 PM, at the Wal-Mart in Bryan, Texas, during which Barham was also present because he coordinated the interview.  Kidd had received a telephone call from Barham thirty minutes before, telling Kidd what to tell Ranger De La Garza during the interview.

58.     After the drugs were planted, **Joyce Hall** was signed up as a Confidential Informant for the Madisonville Police Department by Barham, at a meeting with Jeffery Covington.

59.     Hall stated the deal was for her to make five felony cases and it would help her with her current cases in Madison County.  According to Hall, she was only asked about Laura and no one else; however, Hall would not receive credit towards her five cases for helping secure Laura's arrest.

60.     Hall's signed CI contract with the MPD was signed and dated June 13, 2011, the same day that Barham's reprimand was issued for the lost drug evidence from May 2011.

**May 13 Lost Drugs & June 13, 2011 Reprimand of Barham**

61.     On May 13, 2011, a search warrant was executed by the Madisonville Police Department officers on a suspected drug house in Madisonville.  Evidence was collected and Barham was responsible for custody of the evidence and delivering it to the evidence room at the Police Department.

62.     When the drug evidence (crack cocaine) seized in that search could not be found or accounted for, an investigation was conducted by Covington.

63.     It was determined that the evidence had not been delivered to the evidence room.

64.     According to Barham, because it was after hours, he could not access the evidence room.  His supervisor at the time, Lieutenant Allen Gudgell, was there with them when

this raid had taken place and told the officers just to place the items in -- in a "security locker" that he had in his office "for safekeeping" until they could access the property room.  Gudgell said that once the officers put them in there, he said that he would make sure that they made them into the property room.[4] Chief Clendennen did not initiate an investigation or report he lost evidence to the district attorney.

65.    On June 13, 2011, Barham was reprimanded for the lost evidence.  He was placed on three (3) months probation.

66.    Although the search occurred on May 13, 2011, Barham's reprimand was not issued until June 13, 2011, the same date that Joyce Hall was signed up by Barham and approved by Jeffery Covington as a Confidential Informant.

67.    Covington determined that Barham was responsible for the lost evidence and issued his punishment.  Chief Clendennen signed off on the findings and reprimand.  Barham was placed on just three (3) months probation by Jeffrey Covington.  His probation would expire around September 13, 2011.

68.    Chief Clendennen testified that as Chief, he did make a determination that Barham was responsible, but that as the Sergeant, Covington issued the punishment.

69.    As a rule, Chief Clendennen automatically signed off on whatever Covington did.  As did Chief May when he took over as Chief of Police on September 19, 2011.  This was later confirmed by each of them under oath.

---

[4] Officer Lawrenz prepared a statement regarding the incident.  He wrote that Officer Barham was designated on bagging and securing the evidence found during the search.  Lawrenz had discovered two "Crack rocks in a pill bottle.  Barham retrieved an evidence bag and held it while Lawrenz dropped the items into the bag.  Upon arrival at the department, Lawrenz was unable to find the bag containing the two Crack rocks.  Barham was unsure where they were placed.  They were not found in the vehicles.

70.     Around the same time, due to interest expressed in the position by law enforcement, a new position of Lead Narcotics Investigator was created by District Attorney Risinger at his office.

71.     Barham applied for the position, and was recommended for the position by Chief Clendennen, Chuck May, who at the time was the Chief of Police for the Madisonville Consolidated Independent School District; and Jeffrey Covington.  Covington, Clendennen, and May, were each listed as references for Barham's application.  Clendennen and May each personally recommending Barham to the District Attorney.

72.     All references to Barham's loss of the drug evidence, his reprimand and probation that he had not yet completed at the time of application, were withheld, removed from the copy of Barham's personnel file produced by the Madisonville Police Department in response to the District Attorney request prior to the hiring of Barham.

73.     Barham was hired as Lead Narcotics Investigator for the District Attorney's Office.

74.     On October 18, 2011, Barham submitted his letter of resignation to the Madisonville Police Department, effective October 31, 2011.

75.     **Barham began working at the District Attorney's office on November 1, 2011.  Ready and now perfectly positioned to follow through with the putting away of Laura Swinner Covington.**

76.     In 2012, the District Attorney became aware of the documents relating to the evidence loss and reprimand in Barham's personnel file that had been obtained by Ranger De La Garza during his investigation, and discovered that they had been withheld from the copy of

Barham's given to him by the Madisonville Police Department prior to his hiring of Barham as a DA's investigator.

77.    Clendennen testified twice that he had personally visited and spoken to the District Attorney to recommend Barham for the position.

78.    Clendennen understood that Barham's position at the DA's office would "dealing strictly with narcotics."  Yet, he (and May) recommended Barham's employment and removed from his file that was produced to the DA the recent reprimand.

79.    State law & TCOLE Rules prohibit the removal of any items from the personnel and disciplinary file of law enforcement officers, and require that agency heads must make files available for inspection by any agency seeking to appoint the licensee.

80.    Chief Clendennen confirmed that nothing could be removed from personnel files without his authority as Chief of Police.  In fact, he kept the files in a locked cabinet in his office.

81.    Barham, however, had been informed by Sergeant Jeffrey Covington that if he successfully completed probation, the Madisonville Police Department had a policy by which the reprimand would be removed from his file.

**August 22, 2011 – Bobby Adams' "failed" Search**

82.    On August 22, 2011, Barham, then an officer with the police department, contacted Bobby Adams, an investigator with the Madison County District Attorney's Office, and told Adams that he had information that "there were narcotics on the seat rail of the vehicle" Laura Covington was in.  Traffic stops were not part of Adams' role as a District Attorney's investigator.   Adams agreed because Barham said**, "it would not look good if someone from the police department pulled her over."**

15

83.    In addition to the specific location of the narcotics, Barham told Adams "that -- that after she had dropped the kids off to school, her normal routine was to go to McDonald's, get breakfast and then go home."

84.    Adams posted himself 200 yards west of the McDonald's and Barham was posted in his own vehicle on the east, a couple of hundred yards or so east of McDonald's. Adams assumed Barham stayed in a separate vehicle in case Laura Covington went in a different direction, someone would be watching her; he was set on the route she would most likely take to go home.

85.    Adams testified that he was speaking to Barham over the radio as Laura drove by. Adams told Barham that she was clocked driving over the speed limit and that should be sufficient probable cause to pull her over.

86.    Adams testified that he pulled over the vehicle of Laura, searched the vehicle, and did not find any narcotics or evidence of illegal activity.

87.    As soon as the search was over, Barham called Adams' cellular phone.

88.    After learning of the failed search, Jeffery was irate and called the District Attorney complaining about Adams' failed search. After Laura was busted with the narcotics, Hall also received a telephone call from Barham letting her know what happened. Hall told investigators she did not care because it did not go toward her five cases she needed to help herself. The five cases were needed in order to meet the requirements of the District Attorney for CI's. Hall's assistance with framing Laura Covington was done in exchange for being signed up as a CI.

89.    The day of that unsuccessful search, on **August 22, 2011**, Jeffrey called District Attorney Brian Risinger, angry that the DA's investigator messed up the search of Laura's car.

Jeffrey told the District Attorney that Laura had drugs on her but his investigator failed to find them during his search.

90.    Barham and Jeffrey also called Jeremy Kidd and told him about the "failed" search.  Jeremy Kidd worried Covington and Barham would think that he, Kidd, had lied about having planted the drugs.

91.    Jeffrey also told DPS Trooper Carl Clary, later on, in October (approximately one month before Clary's stop of Laura) that Laura was carrying drugs on her vehicle; that the DA's Investigator had stopped and searched her but he had not looked under the vehicle.

92.    Jeffrey had told Clary in September 2011, two months before Clary's stop of Laura, that Laura was carrying drugs, exactly where it was on her vehicle (magnetic key holder), and told Clary to stop and search Laura if he got the chance.  Clary said it was not common, as a fellow Canine Officer who deals with narcotcis searches, for Jeffrey to have told him someone was carrying drugs.  It had happened maybe one or two other times, if at all.

93.    Jeffrey had also asked at least two other Madisonville police officers to stop and search his ex-wife.

94.    Jeffrey asked **Madisonville Police Officer Jonathan Lawrenz,** "several times," "2, 3, 4, or more times, in the months before Laura's arrest, to stop and search her as she was carrying drugs.

95.    Lawrenz felt that it was fishy and did not want to get involved. Although Jeffrey did not disclosure his personal motivation to Lawrenz, but "everyone in the Police Department Knew."

96.    Lawrenz was also a canine officer, along with Covington, however, Covington was Lawrenz's supervisor as Patrol Sergeant, but they were the same in terms of canine training.

Lawrenz he had neither received information of nor heard of Laura in relation to drugs, using or selling drugs.  She was never on the narcotics radar.

97.     David Sims, who was then a Corporal with the Madisonville Police Department, recalls at least two occasions when Sims and Lawrenz were in the Madisonville Police Department squad room, Jeffery entered and said, "Hey look, you know I'm involved in this custody battle with Laura.  If y'all can find any reason to stop her and arrest her or [her then husband], if you can find any reason at all to arrest or stop them or do something, it'll help my case."   Sims responded that he was not Covington's private security force.  Barham was with Jeffrey on at least one of those occasions.

98.     Everyone at the police department knew the ongoing personal and custody battles between Laura and Jeffrey, including the Chiefs – Clendennen and then Chief May.

99.     During 2010-2011, after Laura and Jeffrey's Divorce, Laura and her mother felt intimidated and threatened by the constant police monitoring, presence outside their home, on their street and following them as they drove around town.

100.    **A frightened Laura complained to Chief Clendennen, who told her to "get proof."**  So, Laura and her mother started taking photographs with their phones of officers outside, pictures of their rearview mirror showing officers behind them.  Laura went back to Clendennen.  He told her it "would not hold up in court."

101.    In reality, **Chief Clendennen was fully aware of the police presence, as he had ordered it.**  Chief Clendennen knew about the ongoing custody conflict between Laura and Jeffery Covington.   When Jeffrey first talked about the contentious situation, **Clendennen instructed Jeffery to have officers there each time he met with Laura**.

102.    The Madisonville Police Department Policies (implemented by Order of the Chief of Police) required that every external complaint be investigated.  Laura's was not.

103.    Had an inquiry been made, Jeffrey himself would have confirmed this.  As would April Covington and Justin Barham, or Sue Swinner (Laura's mother).

104.    A review of the call records of the Police Department would have proved Laura's complaint.  Several calls for civil standby to Laura's residence placed by Sergeant Covington appear in the call records for Laura's address on Tammye Lane.

105.    April Covington readily confirmed under oath that every time they went over to Laura's house to collect or drop off the children, they had police SUVs escorting them.

106.    The entire police force consisted of 6-8 people t the time, so it was not unreasonable for Laura to be alarmed and terrified when they were all monitoring her and appearing outside her home.

107.    On one occasion, while Justin Barham appeared in police uniform and vehicle at Laura's home to stand guard for Covington per Chief's orders, Barham admits that it was clear the little girl (Paige) could not walk, so he went over and picked her up and took her to Jeffery Covington's car.  Barham said Laura started frantically screaming and cursing at him.  Laura later called and apologized to then-officer Barham for her language.

108.    According to Barham, Madisonville Police Officers would perform these civil standbys of Laura and her home all the time, and all of the civil standbys were requested by Laura and Jeffrey.  He never received a request from Laura, however, only Jeffrey.  Nor did he know that Laura had requested any such thing.

**November 9, 2011, Stop and Arrest by Trooper Clary**

109.     On November 9, 2011, Laura had dropped her children at school and was going home at her typical speed, which exceeded the Madisonville's posted speed limit.

110.     Laura was stopped by Department of Public Safety (DPS) Texas Highway Patrol (THP) K-9 Trooper Carl Clary.  Trooper Clary was a trained canine narcotics officer   Trooper Clary had no intention of searching Laura's vehicle, and observed no suspicious activity on the part of Laura.  In fact, Clary did not even intend to issue a traffic citation.

111.     Upon relaying Laura's name and driver's license information over the radio, which is shared by all area law enforcement agencies including the Madisonville Police Department, Trooper Clary received a phone call on his cellular telephone from Jeffery, sergeant and chief narcotics investigator for the City of Madisonville Police Department, and the ex-husband of Laura.  The call was received within minutes of the stop.  Jeffrey informed Clary that his ex-wife, Laura, had drugs on her, and also that Laura had tried to run over Jeffrey's new wife, April, while dropping the children off to school that morning.

112.     Trooper Clary testified under oath that he would not have searched the vehicle but for the telephone call from Jeffrey.

113.     Trooper Clary asked to search the vehicle, and Laura consented.  Pursuant to that search, a small amount of methamphetamine was found *in a magnetic key-holder precisely where Jeffrey had told the Trooper it would be found* two months earlier.

114.     Trooper Clary reported to the District Attorney and to Texas Ranger Andres De La Garza, and later testified at Jeffrey's criminal trial, that he had also been informed approximately two (2) months earlier by either Jeffrey or Justin Barham that Laura had drugs on her and was carrying methamphetamine *in a magnetic key holder located under the vehicle she was driving*.  Trooper Clary had also been told by Jeffrey when they were both attending canine

narcotics officers training session in September 2011 that Laura carried and used methamphetamine drugs.

115.    Laura was arrested and subsequently charged with possession of a controlled substance and booked into the Madison County Jail on felony drug charges.

116.    The day of Laura's arrest, Jeffrey called District Attorney Risinger and said, "Did you hear that my ex wife got busted?   You're not going to let that bitch ex-wife of mine go are you?"

117.    After Laura was busted with the narcotics, Hall also received a telephone call from Barham letting her know what happened.  Hall told investigators she did not care because it did not go toward her five cases she needed to help herself.  The five cases were needed in order to meet the requirements of the District Attorney for CI's.  Hall's assistance with framing Laura Covington was done in exchange for being signed up as a CI.

**2011 Custody Proceedings**

118.    On November 14, 2011, Jeffrey Covington filed an emergency ex parte petition seeking the immediate removal of two young children, Paige and Parker Covington from the custody and care of Laura on the grounds that Laura was a drug user and/or dealer who had been arrested in possession of methamphetamine and that the children were in danger of immediate harm on November 9, 2011.  Jeffrey petitioned to modify the parent-child relationship to have sole custody and also sought an award of support payments to him by Laura.

119.    Based upon the pleadings filed by Jeffrey, along with supporting affidavits by Jeffrey Covington and by another Confidential Informant, Shelly Huntley, the Judge of the 12th Judicial District Court of Madison County, Texas, ordered the immediate removal of the children from the care and control of Laura through late December 2011.

120.     On December 14, 2011, a hearing was held during which Jeffrey admitted, among other things, that he was terminated from a former security position in Iraq for conduct that violated his employer's drug policies.

121.     At the hearing, Trooper Clary, as the arresting officer, testified under oath that he did not believe the drugs he found belonged to Laura, and did not believe she had committed any crime.  He believed the drugs to have been under the vehicle for some time based on certain facts surrounding his discovery of the drugs.   This was inconsistent with the behavior of drug users/dealers based on his knowledge and experience as a canine officer.

122.     Trooper Clary also testified at that hearing, and again later during the criminal trial of Defendant Covington, that both Laura and her mother stated that they "knew something like this was going to happen," that Jeffrey had told Trooper Clary exactly what would be found and exactly where it would be found some two months before, and that the Trooper had "no clue whose it was" because he "did not find any in the vehicle ... didn't find any , - -any paraphernalia. Usually when I find stuff, its everywhere and this was just underneath the door."

123.     Shelley Huntley testified and ultimately admitted that she had sworn to lies in her affidavit, which was substantively identical to Jeffrey's affidavit with her name and signature. Huntley had signed the affidavit in exchange for Jeffrey helping her with her recent arrests.

124.     The affidavit was drafted by Jeffrey's attorney, where Huntley went to and signed it in the presence of Jeffrey, April and Justin Barham.

125.     Huntley was already a Confidential Informant.

126.     She had not been arrested or in trouble in several years because she was an informant and law enforcement knew not to arrest her.    Until suddenly, in 2011, Jeffrey Covington starting arresting Huntley.

127.     The interrogations or conversations after those arrest(s), during which Jeffrey recruits Huntley in the plot against Laura and promises to help Huntley in return are among those audio/video recordings discovered by David Sims and given to the Ranger De La Garza; and which Chief May knew of and did not disclose or give to Ranger De La Garza.

128.     After Laura supplied the Court and with hair follicle tests showing no drugs whatsoever in the system of the Laura, the two children were returned to her.

**Voluntary termination of Parental Rights**

129.     On November 8, 2012, Jeffrey Covington signed a voluntary relinquishment of is parental rights as to Paige and Parker Covington.  His only condition was that it would not cost him anything, child support or otherwise.

130.      April Covington states that she "absolutely" made him surrender his parental rights.  Having failed at putting away Laura, he had to get rid of Laura and his kids.

**Trooper Clary Reports Suspicions To Texas Rangers**

131.     Immediately after searching Laura's vehicle and arresting her, Trooper Clary contacted District Attorney Risinger and informed him of the arrest.  Clary told Risinger about the statements by Laura and her mother accusing Jeffrey of planting the drugs and stating that they knew something like this was going to happen.  Clary said the drugs looked like they had been there a long time; that Covington had told Clary two months before that Laura had drugs on her vehicle and exactly where to find them, and about Covington's telephone call to Clary during the stop.  Risinger told Clary to send the drugs and magnetic key holder for DNA testing.

132.    On November 9, 2011, Texas Ranger Andres De La Garza of Centerville was contacted by Trooper Carl Clary regarding an arrest he had made on the same day.[5]

133.    Trooper Clary reported he arrested Laura Swinner Covington for Possession of a Controlled Substance (Methamphetamines) on a traffic stop.  According to Ranger De La Garza's Investigation Report,

> Trooper CLARY stated he had been given information by Madisonville Police Officer Jeff COVINGTON (Laura's ex husband) indicating she was in possession and transporting drugs. Trooper CLARY was told by Officer COVINGTON exactly where the narcotics were to be located in her vehicle.
>
> Excluding the information given by Officer COVINGTON, Trooper CLARY had not observed any clues or indicators of deception from Laura COVINGTON, nor did she act like she was attempting to hide drugs. Trooper CLARY stated based solely on information he had received from Officer COVINGTON, he requested consent to search Laura COVINGTON'S vehicle.  Trooper CLARY found illegal narcotics exactly where Officer COVINGTON told him they would be on her vehicle.

134.    An interoffice memorandum submitted to Ranger De La Garza by Trooper Clary documented the events of Jeffrey Covington contacting and disseminating information to Trooper Clary regarding the alleged possession and alleged trafficking of narcotics by Laura reads as follows:

> **Event 1:**  Approximately two to three months ago, Officer Jeff Covington came to me and stated his ex-wife was transporting methamphetamines. He stated she keeps the narcotic underneath her vehicle inside an extra key holder on the door frame underneath the driver door.  He stated he was in a custody battle with her and he needed to get his kids from her.
>
> **Event 2:**  Approximately one month ago, Officer Jeff Covington came to me and stated Officer Bobby Adams had stopped his ex-wife and searched her but failed to look underneath the vehicle so he did not find anything.

---

[5] Trooper Clary's suspicions were initially relayed to Texas Ranger Jeter, who is a Texas Ranger in the Madisonville area, who was unavailable and referred the matter to Ranger Andres De La Garza of Centerville for investigation.

**Event 3:** On 11-9-11 at 7:57 AM, I stopped Laura Covington for a speed violation. I noticed her name and assumed it was Officer Jeff Covington's ex-wife. I ran her information over the Madison County primary radio. While I was running her license, at 8:07 AM, Officer Covington calls my cell phone and asked if I had his ex-wife stopped. He stated she had tried to run his new wife off of the roadway this morning. The call was 22 seconds long.

**Event 4:** While I was running her information through my in car system and throughout the whole traffic stop, ***I noticed City Police vehicles were swarming the area and not stopping. One Officer stopped to the side of my unit and asked if "I had it". Another stopped on the other side of my unit and got out and looked but did not stay. Usually when I am searching a vehicle, they will stop by and watch the subject for me.***

**Event 5:** I searched inside the vehicle for narcotics and found no trace of illegal narcotic or paraphernalia. I then searched underneath the vehicle where Officer Covington said the narcotics would be and I found the extra key holder underneath the driver door on the inside door frame. I noticed the key holder had not been touched for some time due to the road debris that was on it. When I took it down to open it, I smudged the top of it. I opened the box and found two bags of what appeared to be methamphetamines. I noticed that the narcotic had a green tint to it.

**Event 6:** At the jail, Sgt. Cornellius came to where I was booking Covington in. He asked me what I had. I told him I had found some meth underneath her vehicle and she was stating it had been planted underneath her vehicle. I told the Sgt. I was going to send the key holder to the Austin Lab tor prints and DNA because of the accusations.

**Event 7:** At 9:55 AM, I received a text from Officer Covington. The text was "how much did you get". I replied "point eight five grams". At 9:57AM, I received another text from Officer Covington. The text was "wow nice".

**Event 8:** At 11:06 AM, I received a call from Officer Covington. He asked me about the traffic stop and I told her she was stopped for speeding and what I had found. He stated "now maybe I can get my kids from her". I told him she was accusing him of planting the narcotic on her vehicle. I told him I was sending the narcotic and the key holder to the Lab to be examined for finger prints and DNA for his protection due to the accusation against him. The call lasted two minutes and eight seconds.

**Event 9:** On 11-10-11 at 11:01 AM, Sgt. Becky Salazar, CID, Bryan called to inform me a Liz from CPS wanted me to call her about the case on Covington. At 11:04 AM, I called Liz from CPS and she put me on

speaker phone with the case worker that was assigned to the case. She asked me what I had found and how much I had found. The call lasted four minutes and twenty five seconds.

135.    Trooper Clary found it highly unusual that Jeffrey had asked him how much narcotics were found on Laura's vehicle, but not *where* they were found. He said this was a very serious red flag because as canine officers, they were always interested in "concealment methods." The first question in this situation was always "where did you find it?" Covington had not asked Clary.

136.    Both Trooper Clary and Professor Raymond Shearer found it significant that Madisonville Police Officers were swarming the scene, and that they had not stopped or offered assistance, which was their custom.[6]

137.    On November 10, 2011, at approximately 1:30 PM, Ranger De La Garza received a call from Trooper Clary regarding the telephone conversation in which Clary conferred with Grissom, who is a **Child Protective Services Investigator Supervisor**. Grissom had asked what type of narcotics he found and the quantity.

138.    Ranger De La Garza also conferred with **Investigator Grissom** who stated there had been a long ongoing child custody battle between Officer Covington and Laura. "Investigator Grissom stated she had concerns about the narcotics that were found in Laura's possession and the legitimacy of them being rightfully hers." (Report of Texas Ranger Andres De La Garza.)

---

[6] Professor Shearer, Police Practices Expert and retired twenty-six veteran of the Beaumont Police Department explained that it is "common practice, even if it's a single occupant of a car, for a second officer to stop. If there's more occupants, more officers may stop depending on how many occupants are in the car. For them to circle and not stop, that shows more than just a casual drive-by. And the vehicle being a red Chevy Avalanche, I'm sure in a town with a population of only about 4,000 people, probably wasn't any others. So I felt sure they probably knew who it was that was stopped. So, curious about what was happening but not wanting to get involved" …. "a telling thing is that when police officers, who can be very creatures of habit in their wor[k] ethic don't do what they normally do when the trooper has the car stopped -- and it was a red Avalanche, which is kind of an obvious vehicle, you don't see very many of those -- **it appears that this was one of those things that everybody in the department knew what was going on and nobody did anything about it**. Nobody tried to stop it. The one person that did try to stop it was rebuffed by the Chief. And I think ultimately he left the department."

139.    On November 14, 2011, Texas Ranger De La Garza arrived at the Madisonville Police Department (MPD) to conduct an interview with Sergeant Jeffrey Covington.

140.    Ranger De La Garza met with **Madisonville Police Chief Chuck May** and apprised him of the situation, indicating he needed to speak with Jeffrey.  Ranger De La Garza met with Chief May and Jeffrey in Chief May's office.  He told Jeffrey the meeting was in reference to information he [Jeffrey] passed along to Trooper Carl Clary regarding the whereabouts of illegal narcotics found on the vehicle of Laura.

141.    Ranger De La Garza explained the concerns based on the information and expressed by Trooper Clary.  Ranger De La Garza told Jeffrey that he was not the target of an investigation, "**but his knowledge of where the illegal drugs were located on Laura's vehicle needed to be revealed**."  "Ranger De La Garza explained it was necessary to divulge the source of his information even if it meant burning a confidential informant.  Ranger De La Garza explained **because of the turbulent nature of his and Laura's divorce and custody battle for their children, this confidential information must be disclosed.**"

142.    Ranger De La Garza said he needed to know all the details surrounding the information provided Covington regarding alleged drugs and their e location that had been provided to Clary months earlier and again during the stop; he said he needed every source, their names.  Ranger De La Garza said that he would then go and interview each of those people.

143.    Jeffrey did not answer the questions and called his attorney.

144.    Afterwards, Ranger De La Garza expressed to Chief May that he was disappointed in Jeffrey.  Chief May agreed:  "Chief May said he did not understand why Jeffrey Covington would not just meet and discuss what he knew about the drugs found on Laura Swinner Covington's vehicle.  Ranger De La Garza agreed with Chief May's comment, adding all

that was needed was Jeffrey's source of the information.  Having that information would resolve issues and concerns about the possibility of wrong doing by Jeffrey.  Ranger De La Garza left the MPD and contacted Lieutenant Pullen, apprising him of the situation and the possible contact from Roger Knight.

145.    After meeting with the Chief and Jeffrey, Ranger De La Garza conducted an interview at the Madison County District Attorney's office with **Leslie Anne Allen**, the administrative assistant for the District Attorney.  Allen was the stepmother of **James "Jimbo" David Richards**, who was in her opinion a known drug user.  Allen stated Richards told her he had been contacted by Jeffrey to spy on and help plant evidence on Laura.  The intended purpose was to catch Laura in order that Jeffrey could use that information against her in a custody battle for their children.

146.    Allen had told Richards to help the police to do the right thing because it may help him with his cases at a later time.  Allen stated her concerns about the timing of these events; Richards was made a confidential informant by the Madison County District Attorney at the same time the incident with Jeffrey and Laura took place.

147.    **Madison County Sheriff Ryan Poe Statement**.  On or about December 2014, Madison County Sheriff's Deputy Ryan Poe as told by Jeffrey that if the grand jury returned an indictment against him, he was going to kill Laura.  Sergeant Poe warned Laura, even advising Laura on what type of gun she should get.  He stated that they would do everything they could to protect her, but… he warned her to be careful.

148.    Ranger De La Garza questioned Sergeant Poe.  Poe explained that he was not uncomfortable providing a statement about an officer; his position was that if Covington did what

they say he did, he deserved to be held accountable; and that if Ranger De La Garza was still investigating after more than a year, there must be something to it.

149.   Still, Covington had not been placed on administrative leave or demoted.

150.   On June 5, 2013, Ranger De La Garza received **new information regarding criminal activity involving Jeffery Covington and Barham and Scotty Porter.**  Ranger De La Garza met with "Navasota Police Department (PD) Investigator Mike Mize and Grimes County District Attorney Investigator Travis Higgenbotham regarding the new allegations.

151.   Investigator Mize reported Madisonville Police Department Officer **Jonathon Lawrenz** was given first hand information from Scotty Porter stating Porter had been paying Justin Barham and Jeffrey Covington each $1000.00 every month for protection of his dope shipments coming in to Madisonville, and to allow him to deliver any narcotic substances without being arrested.  Porter also claimed he occasionally paid them with illegal narcotics. Porter also said he provided dope which Covington and Barham used for planting on others.

152.   On June 7, 2013, Ranger De La Garza met with Chief May and Officer Lawrenz at the Madisonville Police Department.

153.   Officer Lawrenz gave Ranger De La Garza a copy of an audio/video recorded interview between him and Porter detailing these accusations against Covington and Barham:

> On 06-07-2013, at approximately 3:50 PM, Ranger DE LA GARZA arrived at Madisonville PD and met with Chief Chuck MAY and Officer LAWRENZ.  Ranger DE LA GARZA stated he received information from Investigator MIZE indicating Officer LAWRENZ had arrested PORTER, who gave information and made allegations against Jeffrey COVINGTON and Justin BARHAM.
>
> … Officer LAWRENZ explained PORTER told him about paying COVINGTON and BARHAM each $1000.00 a month for protection against being arrested and information about when he was being watched by law enforcement.  Officer LAWRENZ stated PORTER also said he gave COVINGTON and BARHAM dope, which he believed they used to plant on

> other people. Officer LAWRENZ stated some of the information was said
> while PORTER was not recorded on audio/video. Ranger DE LA GARZA
> requested a written statement detailing all the events both on and off
> audio/video. Officer LAWRENZ indicated he would have the statement
> ready within a few days. Officer LAWRENZ gave Ranger DE LA GARZA a
> copy (Exhibit 3.1) of the audio/video recording in which PORTER made the
> allegations against COVINGTON and BARHAM.

154.     Officer Lawrenz also told Ranger De La Garza that while Covington was working for the Madisonville Police Department, Jeffrey approached him several times about conducting a traffic stop against Laura Swinner Covington. According to Lawrenz, Jeffrey said if he made the traffic stop and searched her vehicle, he would find dope. Officer Lawrenz told Ranger De La Garza it never seemed right what Jeffrey Covington was asking him to do, so he did not do it.

155.     Officer Lawrenz related yet another incident to De La Garza. He said that when he began working for the Madisonville PD, he observed the largest crack rock he had ever seen; it was located in their evidence storage facility. After he became part of the K-9 unit for Madisonville Police Department, he looked for that particular crack rock previously seen in the evidence storage facility, but he could not find it. When Officer Lawrenz asked Jeffrey about that particular piece of dope, Jeffrey replied by saying he did not know where the rock was. Officer Lawrenz told Chief May in front of Ranger De La Garza it was something that had always concerned him, but he had never said anything to the Chief until now.

156.     Lawrenz said that he had made a traffic stop on Scotty Porter roughly one year ago. He had requested consent to search the vehicle, which Porter denied. Officer Lawrenz requested the K-9 unit, who at that time was Jeffrey Covington. Jeffrey arrived at the scene and utilized his dog on a free air search of the vehicle. According to Jeffrey, the K-9 did not alert.

157.     Officer Lawrenz and Chief May both validated through their comments to Ranger De La Garza the accuracy of that K-9.

158.    Officer Lawrenz stated due to his lack of experience at the time, he may not have recognized if the K-9 alerted or not.  However, Lawrenz was currently working with the K-9 on that signal.

159.    Ranger De La Garza requested Officer Lawrenz look for that specific traffic stop, and if it was audio/video recorded, to view it now and see if he recognized the K-9 was actually alerting to the vehicle.

160.    On June 10, 2013, at approximately 3:15 PM, Ranger De La Garza arrived at Madisonville PD and met with Chief May.

161.    Chief May conveyed to Ranger De La Garza that Scotty Porter's grandmother had told May that she had received telephone calls from five different officers (prior to his taking over the department) regarding some missing money.  According to the grandmother, the officers asked her about $25,000.00 which was missing.  Chief May stated this money was possibly connected to her grandson, Porter.

162.    Ranger De La Garza requested a written statement from Chief May regarding the video, and any information he heard from Porter and his grandmother regarding his allegations against Jeffrey and Barham.

163.    Chief May then, (long after Jeffrey Covington's arrest and resignation), apparently in the spirit of cooperating with the Rangers' investigation, "gave Ranger De La Garza a video of a traffic stop conducted by Madisonville PD Officer Eugene Harbin and Jeffrey on Laura in June of 2010.  May stated he had not watched the video but wanted to pass it along to the Ranger for review." [7]

---

[7] "On 06-11-2013, at approximately 11:45 AM, Ranger DE LA GARZA reviewed the traffic stop conducted by Officer HARBIN and Jeffrey COVINGTON on Laura SWINNER COVINGTON. Laura was stopped for a defective license plate light. She was given a written warning and was questioned about where she traveled

164.    **Significantly, Chief May did not provide the incriminating recordings discovered and disclosed to Ranger De La Garza by Corporal Sims and for which Sims was fired; nor did he disclose Sims' reports to Ranger De La Garza or identify Sims as having potential information.**

165.    In fact, Ranger De La Garza and Assistant Attorney General Glickler were unaware of any recordings in the possession of Jeter or produced by Chief May or Covington until Covington filed a motion to suppress the recordings before his criminal trial, claiming they were illegally obtained by David Sims (discussed below).  Before the hearing on the motion to suppress, Sims informed Assistant Attorney General Glickler that the recordings had been voluntarily provided to Ranger Jeter by Chief May and Covington.

### Jeffrey Covington's Employment Background

166.    Jeffrey Covington's peace-officer background before coming to Madisonville in 2009 was as follows:

167.    From 1999-2000, Jeffrey was a reserve part-time deputy with the Burleson County Sheriff's Department while he was completing basic peace officer training.

168.    Jeffrey was appointed on August 10, 2000, with a conditional peace officer's license, by the Madisonville Police Department.

169.    Jeffrey received his basic peace officer license certification on August 1, 2001, and became employed by the City of Madisonville.

170.    On or about March 28, 2004, Jeffrey submitted his resignation from the Madisonville Police Department to accept a position as an investigator with Madison County

---

from and where she was going. During a portion of the traffic stop, Jeffrey was speaking to Officer HARBIN regarding Laura's vehicle."

District Attorney's Office to serve as a Narcotics Investigator with the Brazos Valley Narcotics Task Force (headquartered in Bryan, Texas).

171.    On March 31, 2004, former City of Madisonville Chief of Police Sweetin submitted an F-5 "Separation of Licensee" regarding Covington to the Texas Commission on Law Enforcement (TCOLE), which stated, "date license started with the agency 8/10/2000; date of separation 3/28/2004."

172.    Jeffrey was hired by the Madison County District Attorney, who at the time was Bill Bennett, and assigned to the Brazos River Valley Drug Crime Task Force by the Madison County District Attorney.

173.    Then around 2006, Jeffrey submitted an application online for private employment with DynCorp International ("DynCorp"), a private corporation headquartered in Dubai, and served as a private security contractor to the United States' Army's Iraq Forces.

174.    Jeffrey resigned from the Madison County District Attorney's Office, and after attending a 2-3 week selection process in Virginia, Jeffrey was hired by DynCorp beginning April 22, 2006.

175.    Jeffrey's employment contract dates with DynCorp were: April 22, 2006 – April 21, 2007; April 22, 2007 – May 21, 2008; May 22, 2008 – February 4, 2008; and the final contract February 5, 2009 – August 4, 2009, which was terminated early by DynCorp on February 8, 2009.

176.    Jeffrey was assigned by DynCorp to work in Mosul, Iraq, as a Police Advisor. His duties were to mentor and advise Iraq police, while there, he ran across David Sims, a former Madisonville Police Officer who was on active duty as a United States Army Military Policeman.

33

177.    In February 2009, Jeffrey was investigated by the United States Army Crime Intelligence Division (U.S. Army C.I.D.) for the local purchase of drugs using an Iraqi Policeman (Ali, AKA "House Mouse").  The investigators determined that Jeffrey Covington had violated Policies and Codes of Conduct, including "No IPA shall at any time consume, inject, or possess any illegal drugs. or any of its derivatives. This includes the use, possession or possession for the purposes of distribution of any steroid in any form, intended for the use of recreational (non-medicinal purpose) muscle enhancement.  Mr. Covington admitted that he attempted to purchased Viagra from off the Iraqi economy because it was cheaper to buy it here (Iraq) than in the U.S. and without a prescription."__It was concluded by the US Army and his employer that "Mr. Covington's misconduct indicated that he was a threat to the health, safety, and welfare in the community, as well as a detriment to good order and discipline.  Mr. Covington was ordered not to enter, re-enter, remain upon, engage in activities upon, or be found within the limits of FOB Marez."

178.    The United States Army JAG requested that DynCorp take disciplinary or administrative action against Jeffrey.  As a result, DynCorp immediately terminated Jeffrey and deported him from the country, back to the United States, at his own expense, and denied his end of contract bonus pay.

**Licensing of Covington**

179.    Because he was privately employed from 2006 through 2009 and not appointed by a law enforcement agency in a qualifying capacity for more than one hundred and eighty (180) days, and because he had not been on active military duty, Jeffrey forfeited his certification as a Texas licensed peace officer.  In addition, because he had not completed any of the State Law/TCOLE mandated training hours.  Officers are required to maintain and report to TCOLE a

minimum of forty (40) hours every two-year cycle.  Jeffrey had not completed training for two consecutive two-year periods from 2005 through 2009.

180.    When Jeffrey Covington returned to Madisonville, he was unaccredited by the Texas Commission on Law Enforcement ("TCOLE")

### Rehiring of Covington in 2009

181.    Gary "Paco" Clendennen was the Chief of Police for Madisonville from 2008 through 2011.  Chief Clendennen interviewed and hired Covington beginning July 16, 2009, as a police officer with the Madisonville Police Department.

182.    State law and TCOLE Rules *require* certain checks be performed by a Chief Administrator of a law enforcement agency prior to that agency's appointment of a licensee as a peace officer.  At a minimum, ***even with less than 180 days break in service,*** the agency head is required to obtain a detailed personal history, including all employment by the application and perform a thorough background check; obtain an authorization for full release of information is required from the applicant; obtain a psychological evaluation; and the officer must have current annual weapons certification.

183.    By submitting a L-1 Report of Appointment to TCOLE, the Chief of Police is swearing that these have been completed and are on file, and that the applicant is qualified.  When there has been 180 days or more break in service, the Chief Administrator of a law enforcement agency has a more detailed routine to follow prior to that agency's appointment of an applicant as a peace officer.

1.    It was clear that Jeffrey had been unemployed by a law enforcement agency for about 3 years, more than the statutory minimum of 180 days.

2.      An L-1 Appointment of Licensee form was completed by Chief Clendennen and forwarded to TCOLE for Covington inappropriately because not only was Covington no longer certified and eligible to be a police officer in the State of Texas, but none of the statutorily required checks into Covington's background had been performed by Clendennen.

3.      The failure to check and correct false submission to TCOLE was the result of a deliberate choice by Clendennen.  The paperwork appears in other officers' files, but was skipped for Covington because the contents would have prevented his acting as a police officer in the state of Texas.

184.    Had the personal history statement been obtained, this would have been clear. Furthermore, Jeffrey's termination from DynCorp for drug related conduct would have foreclosed any law enforcement appointment.  It was forever fatal to his career in law enforcement. [8]

185.    Clendennen confirmed his handwriting on an unsigned appointment of licensee form for Jeffrey Covington, on which he had written "Not approved as of yet! "7/14/09."

186.    There was no finalized form.

187.    In the records produced by the City in response to discovery requests from David Sims in his separate federal lawsuit, the City produced a set of documents regarding Covington, in series which included the "**7/14/09 Not approved as of yet!" written by Clenndenen *but executed* by Chief May on** <u>**January 17, 2013**</u>**, just a few weeks before Covington's indictment.**

188.    When presented with the paperwork at his deposition, Clendennen was shocked and noted that it appeared someone was trying to misrepresent or falsify documents.

---

[8] Professor Shearer, Police Practices Expert, confirmed that the problem overseas was forever fatal, even if Covington performed his duties lawfully for some period of time after returning.  He answered, "It's fatal forever."

189.    The second page of the paperwork included a self-audit sheet that was supposed to be completed by the applicant/licensee.  It reflected dates of appointment with current agency as 7/14/09 and date of separation from former agency as 7/14/09; the form was completed and signed, but not by Jeffrey Covington or either Chief May or Clendennen.  The form is identical to the self-audit sheet part of lieutenant Allen Gudgell's file, left-handed check marks and all, except for the month "1" is changed to "7" or vice versa.  Jeffrey is right handed.

190.    Jeffrey did not complete the audit sheet, nor did he know why anyone would have misrepresented the information written on it.  Jeffrey, however, had admitted that he disclosed his employment with DynCorp to the City.

191.    That version of the form was not produced in the copy of the file given to Laura Covington in this case.

192.    The forged, backdated L-1 appointment attempted to cover up the series of serious violations of law for which serious criminal penalties are imposed on agency heads and officers alike.

193.    Clendennen had intentionally or deliberately ignored Covington's decertification status, issued him the badge, gun, and powder, and power attendant to the status of a certified peace officer.

194.    Chief of Police May deliberately and intentionally engaged in a cover-up of the fact that Covington was unqualified, had been armed, and given public power without having been screened as required by law.

195.    After Clendennen's deposition in this case, the current Chief of Police, who took over in 2015, submitted a request to TCOLE for L-1's for Covington submitted by his Department.

196.    Clendennen explains that he thought Jeffrey was in Iraq with the military, not a private firm.  However, no military discharge papers appear in Jeffrey's file.

197.    Moreover, Chief Clendennen received a letter from TCOLE dated March 8, 2010, notifying him that Covington had not completed his training hours for two consecutive two-year training periods: September 2005 through August 2009 training unit; and September 1, 2007 through August 31, 2009 training cycle, as required by the Texas Occupations Code, §1701, §1701.351, §1701.352, and §217.11 TCLEOSE Rules.   The letter stated that Clendennen, as Chief Administrator, was required to submit a report to TCLEOSE explaining reasons for noncompliance with §1701.353, Texas Occupations Code, and §217.11(g), TCLEOSE Rules.

198.    Clendennen wrote to TCOLE on April 15, 2010:



**GARY L. CLENDENNEN**                                                    *PHONE (936) 348-3317*

*CHIEF OF POLICE*                                                              *FAX  (936) 349-0149*

**MADISONVILLE POLICE DEPARTMENT**
210 West Cottonwood Street * Madisonville, Texas 77864
(936) 348-3317    (936) 349-0149 fax

**Date: April 15, 2010**

**TIMOTHY BRAATEN**
**EXECUTIVE DIRECTOR**
**6330 E. HIGHWAY 290, STE 200**
**AUSTIN, TEXAS 78723-1035**

**Dear Mr. Braaten;**

**I received a letter from TCLEOSE on March 8, 2010 from your department in reference to officer Jeffery A. Covington (PID #251619). Your records indicate that officer Covington did not obtain his mandatory forty (40) hours in the September 1, 2007 to August 31, 2009 training cycle. While at the Texas Police Chiefs Conference I spoke with TCLEOSE representatives at their table. I explained that officer Jeffery Covington was overseas during this time working for Dyna Corp. as a police officer. It was my understanding that since officer Covington was out of the country, that there was no way to make up these hours. It was my understanding that TCLEOSE would not suspend his license if officer Covington fulfilled his 2009 to 2011 mandatory forty (40) hours of training within ninety (90) days of receiving your letter, but that a Letter of Reprimand would be placed in his file. Officer Covington is in the process at this time to fulfill these forty (40) hours for the 2009 to 2011 training cycle within the ninety (90) days. If I have misunderstood, please don't hesitate to contact me at the Madisonville Police department at (936) 348-3317.**

199. Therefore, at least as of April 15, 2010, Clendennen was aware that Jeffrey had not been in the military but rather had been employed privately, and that this factor drastically changed Clendennen's duties under state law with respect to Jeffrey's appointment and the paperwork submitted and mandatory checks that the Chief had sworn to have followed to TCLEOSE.

200. Clendennen admitted, during his deposition, that at some point before the April 15, 2010, letter, he discovered the basis for Covington's termination from Iraq and when he asked Covington about it, Covington admitted it. Although Covington tried to explain the allegations that caused his termination away, Clendennen said he knew that what Covington had done was illegal.

201. Clendennen stated unequivocally that he would not have hired Covington had he been aware of the information.

202. Moreover, he acknowledged that he *could not* have hired Jeffrey because a break in service of more than 180 days rendered him uncertified as a police officer. i.e. he cannot be appointed or work as a police officer in Texas.

203. Under certain circumstances, if the officer has completed regular training courses (at least 40 hours per year), and other factors are satisfied, he may apply to TCOLE for a continuation of his licensing, but Clendennen knew that Jeffrey had not maintained his training since 2005.

204. Chief Clendennen had submitted an L-1 Appointment of Licensee request to TCOLE without satisfying any of his obligations as the chief administrator. When he discovered the omission and misrepresentations to TCOLE (Crimes), and even though he knew this rendered

Jeffrey uncertified as a police officer, Clendennen did not correct the records or report the matter to TCOLE, as mandated by law.

205.     Clendennen did not terminate or reprimand Jeffrey, but instead promoted him.

206.     On May 6, 2010, Clendennen promoted Jeffrey to K-9 Officer.

207.     On July 29, 2010, Clendennen promoted Jeffrey to Sergeant.

208.     At the time, Jeffrey had yet to complete his training hours that were the subject of Clendennen's letter to TCOLE and interference with the automatic suspension of Jeffrey's license by TCOLE.  Moreover, Jeffrey had not completed the state law and TCOLE mandated supervisory training course for officers who are to serve in a supervisory capacity.

209.     While Clendennen was Chief of Police and supervisor of Jeffrey Covington, Clendennen recalled that Covington would speak with him about his dissatisfaction with the fact that his ex-wife Laura had custody of the two Covington children.

210.     Covington also widely discussed with his subordinate and fellow officers at the MPD his view that the only way he would get custody of his children was if drugs were found on Laura.

211.     Clendennen, having acted intentionally or with deliberate indifference with regard in hiring Covington, and also in promoting Covington into a key position as the MPD's sergeant and leading drug officer, knowing that Covington had the notion that finding drugs on his ex-wife was the solution to his current domestic and economic problems, acted with deliberate indifference to the constitutional rights of others and especially Laura Swinner Covington.

212.     On August 11, 2011, Chief Clendennen submitted his letter of resignation to the City Manager and was instructed by City staff to forego his two-week notice period.

213.     In his resignation letter, which was published in the local newspaper, Clendennen said, *inter alia*:1. While at Madisonville, he had worked for seven City Managers, and three Mayors; 2. He had seen things that are unethical and allowed to continue; 3. He had been threatened and intimidated by persons to do their bidding or lose his job; 4.  Some on City Council are in it for the power and their own personal gain.

214.     Clendennen served as Chief from 2008 to August 2011.

**Chief Claude "Chuck" W. May**

215.     Claude May was hired by the City Manager for Madisonville as the new Chief of Police beginning on September 19, 2011.

 **David Sims' Reports to Chief of Police May Prior to Laura's Arrest**

216.     David Sims ("Sims") was a licensed police officer employed by the Madisonville Police Officer beginning in November 29, 2004.

217.     Sims has also been an officer with the United States Military Police/C.I.D for twenty-six years, and carries the rank of Master Sergeant; the highest rank among sergeants below Sergeant Major.

218.     While employed with the Madisonville Police Department, Sims was called to active military duty by the United States Army C.I.D., stationed in Iraq from July 2008 through July 2009; and at Camp Shelby, Mississippi from July 2009 through September 2011.

219.     In Iraq, Sims served in the army as a Military Police Officer, attached to the Drugs C.I.D, and was assigned to the army's unit in the City of Mosul.

220.     Sims and Jeffrey knew each other from their employment by the Madisonville Police Department prior to their travelling to Iraq.

221.     When Sims arrived in Mosul in 2008, he saw Jeffrey working there as a private contractor.   Sims learned that his army commanding officer knew Jeff and considered him untrustworthy.

222.     In February 2009, Sims saw Jeffrey at the airport in Iraq as Jeffrey was getting ready to travel to the United States.   Sims was surprised because he knew that Jeffrey had only very recently returned from leave in the United States.

223.     Sims and Jeffrey knew each other from their employment by the Madisonville Police Department prior to their travelling to Iraq.

224.     Jeffrey told Sims that he was the subject of an army C.I.D. Investigation, that his personal area and property had been searched and his employer, DynCorp, had been instructed by the U.S. Army to terminate Jeffrey's employment and return him immediately to the United States, at his own expense.

225.     Sims asked what the findings and nature of the charges were against Jeffrey, who replied that nothing had been found in the search of his property, but that he had been given a Miranda warning and ordered to leave for violating the drug laws of the United States Army and the drug policies.

226.      Sims did not see Jeffrey again until October 2011, when Sims returned to Madisonville, Texas, and was reinstated by the Madisonville Police Department.

227.     During a visit to Madisonville on leave from the Army prior to his release from active duty in September 2011, Sims had a conversation with Claude "Chuck May" about Jeffrey's termination from employment with DynCorp for the narcotics.   Claude "Chuck" May had not yet taken over as Chief of Police, but was the Chief of Police for the Madisonville Consolidated Independent School District at the time.

228.     Sims had also spoken of Jeffrey to Lynn May, the wife of Chuck May, who worked in the Madisonville Housing Authority ("MHA") under its Director Patricia Welch.

229.     A United States Department of Justice Housing Urban Development Office of the Inspector general later determined that several Madisonville Police Department officers were provided housing at MHA.

230.     Sims was in a meeting with Lynn May and Patricia Welch, and discussed Jeffrey having been rehired by MPD having been terminated by his employer and sent home on the basis of a drug violation. Lynn May said she and her husband were aware of Jeffrey's problem, and had both wondered how he had been able to be rehired by Chief Clendennen.

231.     In April 2011, before he was released from active duty, Sims wrote The Madisonville Police Department and pursuant to the federal statutory laws, requested reinstatement to his former position upon release from active duty.

232.     As a U.S. Army Reservist called to active military duty, Sims retained his TCOLE certification while he was in the service of the U.S. Army in Iraq.

233.     Licensees with a break in service due to active military service are excused, so long as they submit their complete personnel documentation from the military including all honorable discharge papers.   The Madisonville Police Department was aware of these requirements, and they were specifically noted with respect to the rehiring of David Sims; the necessary military paperwork is present in the Madisonville Police Department's personnel file for David Sims.

234.     Chuck May was the Chief of Police when Sims returned to the Madisonville Police Department at the end of September 2011.

235.     Sims was assigned to Patrol duties; Jeffrey, as the Patrol Sergeant, was his supervisor as well as the supervisor of all patrol officers; the head of Narcotics, head of the Madisonville Police Department's K-9 Unit dog, and in charge of the Police Department's Confidential Informants.

236.     In October 2011, prior to Laura's arrest, David Sims heard from various sources, including Coty Simmons, that Jeffery was still trying to find any reason he could to discredit Laura so he could win custody of his children; and specifically that Jeffery was attempting to recruit Confidential Informants and local criminals to plant drugs on Laura's car so that she could be arrested.

237.     Coty Simmons told Sims that Jeffrey came over and sat and talked to her then boyfriend, Christopher Toby Smith, and directly asked Toby to do it.

238.     In early October of 2011, Sims asked to speak to Police Chief May, behind closed doors, and told him of the reports he had been getting.

239.     Sims told Chief May, "Look, I'm getting a lot of word from my snitches that Jeff is trying to find somebody to plant dope on Laura's car because of this custody battle."

240.     Chief May said, "Well, I don't believe it.  It's just a bunch of crackheads."[9]

241.     Sims said that several people telling him similar things, one after another over a period of time, added together into what he believed was a reasonable belief that something was going on, and the Chief had a duty to investigate it.

---

[9] Professor Shearer also noted the significance of the reports by David Sims to the Chief.  And like I said in my statement, a telling thing is that when police officers, who can be very creatures of habit in their wor[k]  ethic don't do what they normally do when the trooper has the car stopped -- and it was a red Avalanche, which is kind of an obvious vehicle, you don't see very many of those -- *it appears that this was one of those things that everybody in the department knew what was going on and nobody did anything about it.*  Nobody tried to stop it.   The one person that did try to stop it was rebuffed by the Chief.  And I think ultimately he left the department …"

242.    Sims was surprised when the Chief dismissed the information, failed to reassign Jeffrey, and did not investigate.

243.    Sims was surprised that the Chief did not consider it or ask any of the questions that would be expected.  Sims thought the response was unusual based on Sims' knowledge and experience in law enforcement.[10]

244.    After Laura's arrest, Sims learned that the Texas Rangers had initiated an investigation regarding dope being planted and the possibility of the Chief having knowledge through officers.    Sims knew the Chief had been warned at least by him and Lawrenz, and inquired as to the Ranger responsible.

245.    On or about June 2012, (approximately four to six weeks before his termination), Sims met with and shared the information he had with Texas Ranger De La Garza of Centerville. Sims told Ranger De La Garza about the information he had received from various sources, about files he had discovered, saved by Jeffrey on the Police Department's system, containing audio and video recordings of Jeffrey conspiring against Laura.  The files included recorded conversations between Jeffery and Toby Smith and Jeffrey and Shelley Huntley.

246.    Ranger De La Garza asked Sims to bring him a copy of the audio video evidence.

247.    Sims saved the on a disc and on June 28, 2012, delivered them to Ranger De la Garza of to assist in their investigation.

---

[10] Professor Shearer agreed.    "This is a very serious allegation against an officer of rank within the department.  If it's true, it needs to be dealt with.   If it's not true, it still needs to be investigated to clear this officer's name.  So either way, for him to have not done anything is basically to say I don't care."  Professor Shearer placed great weight on the reports to the Chief by Sims, because an officer with Sims' background and experience would have done a great deal of soul searching prior to going to the Chief's Office and leveling serious allegations regarding a ranking officer.  He would have been sure that his information was valid.

248.    Subsequently, on or about July 20, 2014, Sims discovered that Jeffrey was compiling an investigative file on him. Sims asked Chief May if he was under investigation. Chief May insisted that he was not, advising Sims to stop being "paranoid."

249.    During the meeting on July 26, 2012, Sims was given a reprimand by Defendant Covington and Chief May for "neglect of duty" for a purported neglect of duty by failing to appear at municipal court; a neglect that was common among all the officers and all officers had received the same letter to their file; and Sims was placed on probation for a period of six (6) months.

250.    Sims discovered and informed the Chief that Sergeant Covington unlawfully possessed a file on his computer showing he had tracked Sims' vehicle and created videos on Sims' vehicle video system.  Chef May asked Sims, "why does he have such a hard on for you?"

251.    The following day, on July 27, 2012, Sims' employment was terminated based upon a clearly inapplicable workplace rule.

252.    Chief May would later claim he did not know of the criminal investigation and allegations against Covington as an excuse for failing to suspend or conduct any inquiry internally, but he was fully aware by the reports of David Sims.   The following exchange was transcribed from the audio recording by Sims of his termination meeting with Chief May on July 27, 2012:

> **MR. SIMS:**   Oh, okay.  Before I sign this, Chief, I want to –
> I have something I want to say is that, you know, I came to you with a problem; and this is how you handled it.
>
> So -- I mean that -- you know, I know I've never stabbed you in the back, and that shit just went out the window because you just did.  I came to you with a problem - a legitimate problem and told you what was going on -- the second time that he's done that on his own - and instead of doing anything about it, you're like, "I'll take care of that shit today," you fired me.  So, you didn't take care of shit and you stabbed me in the back.

MR. MAY:  No, I didn't stab you in the back.

MR. SIMS:  You did, too.  You did, too.  I tried to talk to you about it twice, and this is the way you handled it.  To me, that's stabbing me in the back.

MR. MAY:  Not when –

MR. SIMS:  (inaudible) come to my door any time -- come to my door any time you have something to say.  I did.  Here we are.  It doesn't matter that he was accessing our -- and tracking us and doing all that shit out there after you sat there in the meeting and said, "That's not going to happen."

He made a liar out of you, like I told you yesterday, and it didn't matter that he did it; but that I told you that he was doing it, you know.  And I -- and I told you that he had a file that he was building on me.  I told you that yesterday.  If you would have just asked me, I would have told you how I found it.  It was on a shared file.  I can show you it's on a shared file.  So, I mean -- and this is how you handle it.  Instead of taking care of that problem, you just fire the messenger -- kill the messenger.

MR. MAY:  That's your opinion.

MR. SIMS:  That's a fact.  You are a liar, a bold-faced liar.  Now that I don't work here anymore, I want a complaint form because I want an investigation done on Sergeant Covington for his drug use and kicked out of Iraq for doing drugs, **plus all the files that I have with him and Toby Smith, their voice recordings about him trying to get dope on Laura. I'm going to put that to the Rangers, too, since I'm not working here anymore.**  I tried to get you to handle that, too.  I told you about that, too.  You didn't do anything there either.

**MR. MAY:  That was a D.A. investigation and a Texas Rangers' investigation, not mine.**

**MR. SIMS:  The deal about Iraq was yours.**

253.    Ranger Stephen Jeter contacted Sims on July 30, 2012 under the guise of being part of Ranger De La Garza's investigation of Jeffrey Covington (in which Jeter was never involved), and lied when asked if Sims was under investigation.

254.   The purpose of Ranger Jeter's "investigation" was to find out how much Sims knew and how much Sims had shared with Ranger De La Garza.  The audio-recorded interview of David Sims reflects the following:

> Ranger Jeter:  I know he said something about videos, but did you also give him some Audio?
> David Sims:    "Yeah."
> Ranger Jeter:  "How about we listen to them.  Does De La Garza have a copy?"
> David Sims:    "He has them on a CD."

255.   After the interview, Sims called Jeter to ask if he was under investigation.  Jeter said no.  Sims offered to give him a copy of the audio recordings.  Jeter noted in his report that he had already been provided a copy of the audio/video recordings by Chief May and Sergeant Covington.  Sims told Jeter that Covington was "Dirty and not on the up and up."

256.   ***Chief May did not ever provide those recordings to the Ranger De La Garza.***

257.   ***Ranger Jeter did not share the contents or existence of the evidence with Ranger De La Garza***.

258.   In fact, Ranger De La Garza and the Assistant Attorney General prosecuting Covington were unaware of any recordings in the possession of Jeter and produced by Chief/Covington until Covington filed a motion to suppress claiming the recordings were illegally obtained, and Sims informed the prosecution that the recordings had been voluntarily given by Chief May and Sergeant Covington to Ranger Jeter.  At that time, Ranger De La Garza contacted Ranger Jeter and requested the recordings.[11]

---

[11] Chief May prompted criminal charges against Sims by referring the matter to the Texas Rangers for investigation.   On August 30, 2012, the grand jury indicted Sims for "computer security breach," Texas Penal Code § 33.02. The charges against Sims were eventually dismissed by the district attorney "in the interest of justice," on September 11, 2013.  The prosecutor dismissed the charges against David Sims in the interest of justice."   Ranger Jeter was told by the prosecutor that it was because there might be a whistleblower aspect to it.  Ranger Jeter testified that the District Attorney said, "Per the Covington investigation, it was -- they felt like that there was possibly a portion of this that David could have been protected under the Whistleblower Act and didn't want to have that as an issue.

259.     Sims was not the only person who would alert Chief May to Jeffrey's corruption. At least one other City employee, Officer Jonathan Lawrenz, specifically informed the Police Chief of the suspected activity of Covington in relation to his personal custody issues.

260.     Officer Jonathan Lawrenz had gone to the Chief and shared the same suspicions prior to Laura's arrest, and had been dismissed as well.  Lawrenz reported the information after Jimbo Richards had told Jonathan Lawrenz that Jeffery Covington had asked Jimbo Richards to plant drugs on Laura's car.  Richards also testified to that affect at Defendant Covington's trial in 2014.

261.     Lawrenz testified at Jeffrey Covington's 2014 criminal trial that Covington had attempted to get to him to stop and search Laura Covington more than once prior to her arrest. Lawrenz said that Covington had similarly told him that Laura Covington was carrying drugs; however, Lawrenz did not stop her because he did not want to get involved, as it was "fishy." Jeffrey had not revealed his personal motivation, but "everyone at the department knew."

262.     **James "Jimbo" Richards** was approached by both Jeffery Covington and Justin Barham came to Richards and asked him to plant dope on Laura Covington.  They also tried to make Richards wear a recording device, go to Laura's house and get her to use dope.  Jeffery Covington told Richards he did not have a lot of money, but would watch Richards' back, keep heat off of Richards and help him out.  Richards lied during his first interview by Ranger DLG because, he said, Covington and Barham were watching him from a distance.

263.     **Christopher Toby Smith** was also approached by Jeffrey and those conversations are among the recordings discovered by Sims. One night during one of their conversations, prior to Laura's arrest, Jeffrey Covington asked Smith if he could help Covington by riding with Laura and dropping dope between the seats of her red Chevy Avalanche.  When

Smith got out of her vehicle, he was to call Jeffrey and let him know the dope was in her vehicle. Jeffrey would call other law enforcement officers and have her stopped on a traffic stop with the narcotics in her vehicle. Smith said Jeffrey promised he would help him out, but did not specifically state how.   Smith told Sue Swinner, Laura Covington's mother, about the conversation.

264.     Prior to going to state prison, Toby Smith had penned a letter which was delivered to the Madisonville police department by Michael Tollison, Toby Smith's uncle, containing information including, *inter alia*: 1) a note that David Sims had accepted a bribe of $200 to let Smith go after pulling him over; and 2) that **"Jeff Covington asked me to plant drugs in his ex-wife's car he would pay me.  Months later she gets busted is 9 months preg.  Was set up."**

265.     The information was delivered to Chief May, and then placed in a yellow "Evidence" envelope maintained in the Chief's office (Chief May).  **Chief May's handwriting on the envelope assigned the packet as "EVIDENCE: LETTER FROM TOBY SMITH (DAVID SIMS)"** but did not make any note of evidence against Covington, and no investigation was conducted regarding the substantially more serious allegations included regarding Covington.

266.     During his deposition, Chief May admitted it should have said "Evidence Covington."

267.     Welch had known Jeffrey for many years, and said he was "dirty as hell," referring to him being a bad cop.  Welch knew that had been kicked out of Iraq for his involvement with drugs and upon his return to the United States, the Madisonville Police Department hired him back.  She continued to state Jeffrey Covington took sleeping pills; he eventually had to get professional help because of his habit.

268.    Welch said she had heard of Jeremy Kidd because Madison County Commissioner Ricky Driscoll told her he knew Jeremy Kidd had planted the dope on Laura.

269.    Welch added that she believed Sims had been set up and everyone from Jeffery to Chief of Police May knew what was going on.  Welch had also discussed this with Bobby Adams.

270.    Adams did not feel right about the information he had received regarding the dope. He stated that District Attorney Risinger "gave him a hard time" about conducting a more thorough search.

271.    A Normangee Police Department, Sergeant Jody Navarro, had received information while on a "civil standby" call. From a lady named Sheena Thomas who said she knew of a pregnant woman in Madisonville who had had dope planted on her vehicle by Jeremy Kidd. According to Thomas, the dope was planted at the direction of Jeffrey and Barham. Sergeant Navarro told Laura he had spoken with Kidd and Kidd admitted it.

**No Suspension/Administrative Leave**

272.    Barham was not indicted until after Jeffrey Covington, but on December 17, 2012, immediately after Ranger De La Garza met with District Attorney Risinger and told him that a formal investigation was being conducted against Justin Barham was suspended without pay by the District Attorney

273.    On April 5, 2013, Justin Barham was indicted on charges of Official Oppression; two counts of Delivery/Conspiracy to Deliver a Controlled Substance; and providing a false statement to a law enforcement officer.

274.    The case against Jeffery Covington was initially set to be presented to the grand jury in December 2013, a fact that was commonly known in the community,[12] (example: threats

---

[12]For example, Ranger De La Garza contacted Sergeant POE and discussed the information he had passed along to Laura. Sergeant POE stated he was texting Laura and she asked about guns for self protection. When

toward Laura were at the time he was first scheduled for presentment to the grand jury), but was postponed until February 2015.

275.    Jeffrey Covington had not been placed on administrative leave by the Madisonville Police Department or reassigned from control of CI's and narcotics investigation or his supervisory duties, despite the Madisonville Police Department's policy of placing officers on leave during any and all ongoing investigations, regardless of whether they had internally cleared an officer.[13]

### Charges Dropped Against Laura

276.    On January 31, 2013, Assistant Attorney General David Glickler confirmed that he was taking over as District Attorney pro tem in Laura's case as well and formally declined any all charges related to the November 9, 2011 arrest of the Plaintiff on grounds that "after a thorough review of this arrest and the surrounding circumstances, I have concluded that it does not warrant prosecution and further investigation."

### Indictments & Convictions of Jeffrey and Barham

277.    On February 25, 2013, Jeffrey Covington was indicted on three separate charges: the first charge of Official Oppression; the second charge of Delivery of a Controlled Substance; and the third charge of Obstruction or Retaliation.

278.    At approximately 1:47 PM, Ranger De La Garza contacted Jeffrey Covington and told him three warrants were issued for his arrest.  Ranger De La Garza explained what the

---

Sergeant POE asked why she was inquiring about a weapon, Laura stated she was trying to protect herself because of Jeffrey. Sergeant POE said during this conversation and given the circumstances, he believed he should mention the comment made by Jeffrey about killing her if he was indicted. Sergeant POE told Ranger De La Garza he had gone to a convenience store to get a drink after a late shift. While he was at Buc-ee's, he saw Jeffrey and the conversation took place.

[13] For example, in the *Laws* case, even though the MPD had conducted an internal investigation via Ranger Jeter and cleared Laws of any wrongdoing, Laws was placed on leave pending the DA's investigation.

warrants were for and gave Jeffrey the option to meet him at the Sheriff's office to be booked in, or Ranger De La Garza offered to pick up Jeffrey and bring him to the jail.

279.    At approximately 2:33 PM, Ranger De La Garza arrived at the Madison County Jail and booked Jeffrey in on the three warrants.

280.    By letter on that same day, Jeffery Covington voluntarily resigned his employment with the Madisonville Police Department, citing a private employment opportunity as the reason.

281.    Also that same day, after Covington's indictments and arrest, Chief May submitted an F-5 Separation of Licensee form to TCOLE with an honorable discharge of Jeffrey and classifying his separation as by voluntary resignation.

282.    Even after his indictment and resignation, as of February 28, 2013, Chief May had placed Jeffrey in charge of a private security job for which law enforcement officers were required (jobs that allowed officers to supplement their income and were highly in demand), and announced that no additional officers were needed.

283.    In contrast, Chief May immediately terminated David Sims without investigation because, he said,  "I had enough stuff going on that I could terminate, because I couldn't trust the individual in my department with where we were going in our process of becoming a clean and professional police department.

284.    In his closing remarks, Chief May stuck by his decision because, "We established credibility in that police department and having respect of the community we're in, which we never had."   Chief May, even after being shown evidence during his deposition in this case on August 13, 2015, stated that he continues to trust Covington.  When May took over as Chief, he emphasized publically his intentions of cleaning up the Police Department.

285.     In an article on February 27, 2013, "Since taking over in September of 2011, May has been hard at work cleaning up his force." "May says six police officers have been fired or voluntarily resigned." "The department's credibility is what is fueling his desire to clean up." Chief May identified the six officers who fired or resigned: Brent Brown, Gudgell, Sims, Covington, Barham resigned to go [..] to the D.A.'s office and could not recall the sixth.

286.     On February 27, 2015, Chief May was reported by the press as having been shocked and in disbelief by the indictment of Jeffrey.   He lied and said Jeffrey had resigned the previous last week.

287.     On April 25, 2014, Jeffery Covington was found guilty by a jury and convicted of retaliation.  Pursuant to an agreement with the State, punishment was assessed at five (5) years confinement in the Texas Department of Criminal Justice Institutional Division; the sentence was probated for five years with no fine.  He was required to surrender his peace officer's license. Jeffrey was ordered by the Judge as a condition of probation to serve 30 days confinement in a county jail.  Also as a condition of probation, Jeffrey was ordered to have no contact with Laura or her family by any means.   The charges of Manufacture/Delivery of Controlled Substance (Cause #11892) and Official Oppression (Cause #11893) were dismissed.

288.     On May 29, 2014, an additional charge of False Statement to a Peace Officer (Cause #12036) was filed on Justin Barham in Madison County Court.  On June 4, 2014, Barham pled Guilty and was granted six months deferred adjudication with a fine of $2,000.00. Barham was required to surrender (lifetime) his peace officer's license. The Obstruction or Retaliation (Cause #11894) and Manufacture/Delivery of Controlled Substance (Cause #11896) charges were dismissed.

289.     Jeffrey waived his right to appeal.  Jeffrey and Barham subsequently voluntarily surrendered their TCOLE licenses.  Jeffrey accepted in writing his criminal responsibility for his actions.

## OTHER MADISONVILLE POLICE OFFICERS

290.     It should be noted that when Gary Clendennen became Chief of Police in  2008, the police department consisted of three people, (one of whom was on leave pending departure). By 2010-11, the City of Madisonville Police Department consisted of 6-8 officers, including the Chief of Police.  Madisonville is a city of approximately 4,500 citizens.

### *Lieutenant Allen Gudgell – Lost Drug Evidence; Lost Cash Evidence; Theft.*

291.     Allen Gudgell was a police officer, promoted to Sergeant by Gary Clendennen, and then Lieutenant, and demoted to Sergeant by Chief May, who did not maintain Lieutenants in his chain of command.

292.     Gudgell was a suspect in the DOJ HUD-OIG investigation and the recipient of substantial misappropriated funds.

293.     Gudgell had also been investigated by the Texas Rangers for a complaint lodged by Rita Spencer, the neighbor of the Mayor of Madisonville at the time.  On July 21, 2011, Gudgell had knocked on the Spencer's door while Mrs. Spencer was not at home, and had a conversation with Fannin Spencer.  Rita Spencer received a frantic phone call from her son stating that the police had just been there and asked to speak with Mrs. Spencer about the dogs and that the officer had shot his gun off.

294.     Mrs. Spencer rushed home and when she arrived, her son said that  said that an officer had been there and asked to speak MRs. Spencer, but was communicating very "loudly and gruffly," causing the dogs to become agitated.  Fannin Spencer had asked Gudgell not talk to

him like that, as it was upsetting his dog.  About that time, the dog got loose and was barking at the officer.  At which time the officer, Gudgell fired his gun into the air.

295.     A request was made for the District Attorney to investigate.  Texas Rangers, Ranger Ron Duff, investigated Allen Gudgell for Tampering with a Governmental Record in relation to that complaint.  On March 9, 2011, the Ranger's Report was complete and the case was to be presented to the District Attorney.

296.     Gudgell was not placed on leave or investigated by the Police Department.

297.     In Gudgell's January 13, 2012, evaluation by Chief May, reflect that Gudgell was unsatisfactory in five categories.

298.     Comments attached to the evaluation reflect that Gudgell had been responsible for numerous items of lost narcotics evidence seized from suspects, and that ***several items of missing evidence from several cases in 2011 had been found in a drawer in Gudgell's office***.  Chief May also noted that when the District Attorney began inquiring about seized cash in an ongoing prosecution that had gone missing:

> **Three narcotic cases in August 2011** involving the seizure of narcotics and currency were not submitted to the district attorney's office.  One case was found in the police department property room that had currency, $920 tagged with other evidence from the investigation.
>
> Two other investigations also did not have any seizure paperwork filed with the district attorney and the location of the currency seized in excess of $2,000 could not be located.
>
> On September 30th, 2011, Sergeant Gudgell showed up at the district attorney's office and attempted to turn in the missing money.
>
> There was no seizure paperwork and the district attorney refused to accept the money until the appropriate paperwork was with the currency. Sergeant Gudgell then made contact with Chief May and requested four hours of vacation time for this same day due to a relative coming to town. The location of the currency is unknown and no seizure paperwork was

completed.

299.    Chief May did not conduct an investigation on any of the above.  He was not sure if it was Sergeant Covington or Sergeant Cornelius who had done one, or who brought it to his attention.  Nothing was reported to the District Attorney or the Texas Rangers.

300.    The memorandum continued, "Sergeant Gudgell had narcotics evidence, marijuana in his desk drawer from an investigation on November 16th, 2011 that had not been properly tagged and placed in the police department property room."

301.    When Department members were searching through Gudgell's file for another case that had been investigated by Gudgell, they had discovered the marijuana in his desk drawer – "it was just there."

302.    According to May, he performed an inventory of that entire office, but there is no record of it.   No investigation or report to the District Attorney's office.

303.    Chief May discovered six (6) additional original investigative reports that were dated from August 2010 to May 2011 in Sergeant Gudgell's office that did not have any investigation supplemental reports.

304.    Gudgell was allowed to resign on April 23, 2012, from his position, and still receives pay from the Madisonville POlcie Department.

305.    Gudgell was given an Honorable Discharge by Chief May on his F-5 Separation of Licensee to TCOLE, so he is free to be appointed as a police officer anywhere in Texas with no record of his many misdeeds.

306.    Chief May explained he had not reported any of this to TCLEOSE and was not required to, only if there was definite proof and an indictment had been handed down.

307.    Chief May did not report Jeffery Covington's indictment to TCOLE.

*The U.S. Department of Housing and Urban Development-Office of the Inspector General Investigation of Madisonville Housing Authority (Barham, Gudgell, Chief May)*

308.     As of November 16, 2011, the U.S. Department of Housing and Urban Development-Office of the Inspector General (HUD-OIG) was conducting an investigation into the Madisonville Housing Authority after Madison County Sheriff Travis Neeley reported information about possible inappropriate business transactions in mid-October of 2011.

309.     Then City of Madisonville Mayor, Terri Creel, announced in November of 2011 the appointment of five members to the Madisonville Housing Authority board, with the president selected later.  Mayor Creel said that it had been recently brought to the attention that housing authority board members are a mayoral appointment, and that the board in place had expired since 2008.  "They don't have the authority to do the job."

310.     The allegation of financial improprieties at the Madisonville Housing Authority led to an investigation by OIG-HUD that identified a financial theft of approximately $66,960.53.

311.     The investigation was primarily focused on the fiscal year of October 1, 2010 through September 30, 2011.

312.     The subjects of the investigation included Patricia Welch, Justin Barham, Allen Gudgell, Robin Welch, and Jimmy Wheaton.

313.     Justin Barham and Allen Gudgell both worked for the Madisonville Police Department.  Lynn May, Chief May's wife, was the secretary to Patricia Welch, Director of the Housing Authority.

314.     The Madisonville Housing Authority lost $7,031 in rental revenue as a result of Welch and Barham.

315.     Welch ultimately confessed to theft.  She admitted she had a personal relationship with Barham beginning January 2011.  Welch admitted Barham into the Madisonville Housing Authority when Barham did not meet the income limits to qualify for a housing assistance subsidy.  Barham had multiple changes to his income but failed to report those changes to the Madisonville Housing Authority as he agreed to do when admitted into the housing authority.  Additionally, there was no evidence there was an agreement for Barham to receive a rent concession because he was the On-Site Security Officer.

316.     Barham claimed that he had applied for and qualified for low income housing.  The investigators confirmed his income with Chuck May.  They discovered Barham failed to report multiple changes in his income and claimed he thought he was living there rent free in exchange for providing security service after Jeffery Covington gave up the position.  There was no evidence of an agreement of any sort in exchange for Barham's services.  The investigators also found that Barham had completed one report in his entire time working as the alleged on site security officer for the housing authority.

### Payments to Allen Gudgell

317.     Welch was shown check 12635 for $2,800 and check 12635 for $800, payable to Allen Gudgell.  Neither check included an invoice.  Welch said Gudgell was paid $2,800 to paint the Madisonville Housing Authority community room and office areas as witnessed by Receptionist Lynn May (May) and $800 to paint a side located outside. [ Agent Note: Welch is believed to have had a personal relationship with Gudgell.  Allegations were also made that funds from the Madisonville Housing Authority were used to remodel Gudgell's personal residence.]

318.     [Lynn] May was interviewed on or about May 21, 2012, and stated that ·she did not witness Gudgell painting anything at the Madisonville Housing Authority.  May recalls that

she left work on a Friday and when she returned on Monday, the office was painted.  Welch told May that she (Welch) had painted the office over the weekend.  May does not ever recall the community room being painted. May also recalled that Welch complained about a sign that Gudgell was supposed to have painted.

319.    On or about November 1, 2011, Gudgell said he received $800 to paint a sign for the Madisonville Housing Authority. Gudgell also said that Welch asked him to paint the office and community room. Gudgell did not want to do the painting so he submitted a bid that was high and was awarded the job. Sometimes in 2011, Gudgell was remodeling his home and Welch purchased some cedar trim and carpet for him. Gudgell is unaware how Welch paid for these items.

320.    The Madisonville Housing Authority lost $2,800 paid to Gudgell for work that he did not perform.

321.    On April 7, 2011, check No. 12593 for $250.00 was written to the Texas Police Chiefs Association to pay the annual dues for Gudgell.

322.    On April 18, 2011, check 12605 for $276.00 was written to the Renaissance Hotel to pay for a room for Gudgell. It appears this was to attend the Texas Police Chiefs Association conference.

323.    Welch and [Lynn] May attended at professional conference in about August 2011 and stayed at the Crowne Plaza River Walk in San Antonio, TX.  Welch paid the Crowne Plaza with check 12706 for $888.   The Crowne Plaza bill included $53.24 in room service and restaurant charges made to Welch's room for meals.   Welch was paid a per diem by the Madisonville Housing Authority that covered her meals.  The Crowne Plaza was paid $ 888 but the bill only totaled $835.12 with the overpayment of $52.88 paid to Welch.

324.    Welch received the benefit of $106.12 that she was not entitled to receive.  Welch submitted a travel voucher and was reimbursed using check 12711.  Welch paid herself mileage but also submitted gas receipts and was reimbursed $71 for the gas receipts.  One of the gas receipts submitted was a charge to a Visa credit card belonging to Barham.  Welch received an extra $71 in reimbursement for gas that she was not entitled to receive.

325.    Chief May testified that he was unaware that Barham was living rent-free or the investigation or of the events at the Housing Authority.  He claimed he was unaware of any relationship between Barham and Welch.  He then admitted that he had attended that conference with Lynn May, and Welch had attended with Barham as her guest, and Chief May was aware of their relationship and they were there altogether.

326.    Furthermore, Chief May had been present at Justin Barham's request during his interview by the federal investigators, after Barham had gone to work for the District Attorney.

327.    Chart of Discovered Embezzlements from Madisonville Housing Authority:

| Amount | Description of Loss | Person(s) Responsible |
|---|---|---|
| $  1,371.40 | Installation of Campbell Security at Welch's personal residence | Welch |
| $  7031.00 | Failure to collect rent from Barham | Welch, Barham |
| $ 35,626.62 | Un-deposited rent receipts for FY 2009 and FY 2010 | Welch |
| $  2,292.80 | Use of Shell gas card for fiscal year 2010 | Welch |
| $  1,150.00 | Welch payment for MOD Coordinator duties | Welch |
| $  2,800.00 | Payment to Gudgell for painting that he did not do | Welch, Gudgell |
| $  899.99 | Conn's purchase of sofa, chair, and ottoman | Welch |
| $  9,875.00 | Rent subsidy and utility allowance | Welch, Wheaton, Robin |
| $  757.93 | Vizio TV purchased at WalMart | Welch |
| $  2,493.67 | Purchases at Home Depot | Welch |
| $  250.00 | Texas Police Chiefs Association dues | Welch, Gudgell |
| $  276.00 | Renaissance Hotel | Welch, Gudgell |
| $  1,959.00 | Payments to Fautheree | Welch |
| $  106.12 | Overpayment to Crowne Plaza benefitting Welch | Welch |
| $  71.00 | Overpayment in gas reimbursement | Welch |
| $ 66,960.53 | Total loss attributed to all parties | |

***Madisonville Police Officer Melissa S. Gore***

328.    Around April 22, 2010, a civil rights complaint was filed by a Meghan Colbert against Jeffery Covington and his police partner at the time, Madisonville Police Officer Melissa S. Gore.  The officers were, as expected, cleared by the "internal investigation."

329.    At the Quarterly Meeting of TCLEOSE in December of 2011, the Commission accepted the permanent surrender of license by Madisonville Police Department officer Melissa S. Gore.  Gore voluntarily surrendered her TCLEOSE license after she allegedly pulled a pistol on her estranged boyfriend for breaking up with her.

***Gary Laws***

330.    Gary Laws, another former Madisonville Police Officer was on trial after the unfortunate death of his police canine partner.

331.     Laws was acquitted by a jury; however, there are other allegations of misconduct by Laws.  For instance, on January 8, 2014, Court of Appeals of Texas, Waco, issued a decision in *Jennifer Kelly v. State of Texas*, No. 10-14-00015-CR.  A jury convicted appellant Jennifer Kelly of the offenses of trafficking of persons and compelling prostitution and assessed her punishment at fifteen and ten years' imprisonment, respectively.   On appeal, Kelly challenged the sufficiency of the evidence to support her convictions for trafficking of persons and compelling prostitution.  The discussion includes allegations of sexual favors by the victim in exchange for favors from Officer Gary Laws.  ("Shelton and M.M. did not get along, but M.M. would talk to Shelton about [Madisonville Police Officer Gary] Laws often.   When asked what M.M. said about Laws, Shelton replied, "She said that her and Officer Gary Laws would mess around and basically have sex."  "She would mention that she had strings she could pull.   But

which basically means she could get out of trouble because of what she was doing with Officer Laws."]

### Jonathan Zitzmann, Assistant Chief/Acting Chief

332.    Jonathan Zitzmann was the Assistant Chief of Police under Chief May, and Acting Interim Chief upon Chief May's retirement.  He returned to his role as Assistant Chief after the current Chief of Police, Herbert Gilbert, was hired by the City in February 2015. Zitzmann left Madisonville around in April-May 2015 and started employment as a deputy at the Harris County Precinct 4 Constable's Office.

333.    On July 7-8, 2015, Ranger Stephen Jeter confirmed under oath during testimony in the matter of State of Texas v. Gary Laws that there was an open criminal investigation into Jonathan Zitzmann.  Ranger Jeter did not expect that any charges would result from the investigation and said that the case was not being presented to a grand jury.  Jeter did confirm, however, that a case against Chief May was going to be presented

### Case Against Former Chief May to Grand Jury

334.    Ranger Jeter confirmed during his testimony on July 2015 in the matter of *The State of Texas v. Gary Laws* that a case against former City of Madisonville Police Chief Chuck May was going to be presented to a grand jury.  Chief May announced his retirement in January 2015 and has been in Drummond Island, Michigan, though he retains a homestead in Grimes County, Texas.

335.    The Madisonville Police Department has had a longstanding practice of disregarding complaints against officers and turning a blind eye and knowingly permitting misconduct.  For example, Ranger Jeter was called to conduct all investigations of complaints against police officers.  Jeter was noted as having disliked Laura Covington from the very first

time he met her.  Jeter's investigations have never found wrongdoing by a police officer, except for David Sims.   Jeter "investigated" and concluded based on Chief May's statement that Sims had "hacked" files on Covington's computer that Sims had committed a breach of computer security.   The use of the word "hack" by Chief May, and the brief statement by Sergeant Cornelius – who had been attempting to report to the Chief the secret files Covington had been keeping on Sims, and not the fact of Sims having discovered them; and in fact provided a sworn statement in support of Sims stating that he had shown the Chief how he could access files using the Chief's computer—comprised Ranger Jeter's investigation.  Ranger Jeter emphasized his lack of understanding of computers or technological matters. Despite the findings of the Administrative Law Judge in favor of Sims and the prosecutors position Ranger Jeter insists Sims is a criminal.

### *The Chief of Police is the Final Policy Maker for the City with Regards to Police Matters and the Police Department*

336.    The City of Madisonville's governance is set up such that each department head governs as the final authority and policymaker for their department.

337.    The Madisonville Police Department, under the authority of the Chief of Police, maintains functional independence from the City Council in police matters including officer discipline.

338.    The City Manager hires and fires the chief of police.

339.    The Police Department maintained separate and complete personnel files for Police Department employees.

340.    The City of Madisonville's governance is set up such that each department head governs as the final authority and policymaker for their department.

341.    The procedures of the City Council specifically refer to the equal treatment and

authority of the City Council, City Attorney, and the Chief of Police; and that City matters should

be referred to the Chief of Police; Police Matters to the Chief of Police, etc.

For instance:

> **Section 16(E)(c):** Requests for legal opinions, research or other legal
> information or action should be requested of the City Attorney either
> through the Council as a body, or the Mayor, or at least three (3) members
> of the City Council, or the City Manager or the Chief of Police.
> …
> **Section 18 (h):** Whenever a citizen or group appears before the Council
> with a complaint or a request for services or information, the matter shall
> be referred to the City Manager/City Attorney or Chief of Police for a
> response
>
> **Section 9. Role of Council / City Manager**
> a. The City Council's role is to establish policies and priorities within the
> terms of the City and applicable State and Federal Statutes.
> b. The City Manager is responsible for directing and managing the daily
> operations of the City government.
> c. The City Manager is responsible to the City Council as a whole rather
> than to individual Councilmembers, Mayor, City Attorney, City Secretary,
> Municipal Judge or Chief of Police.
>
> **Section 10.   City Attorney's, City Secretary's and Municipal Judge
> Relationship to Council: .. (A)** The City Attorney, City Secretary and
> Municipal Judge are accountable to the City Council as a body, not to any
> individual member or group of members, nor the Mayor, City Manager,
> Municipal Judge or Chief of Police.

342.    There is no similar policy regarding the Chief of Police's accountability to any

other City officer.

343.    The City's policies do not refer to the Police Department or any police matter.

The City's policies do, however, permit authority to be delegated by each department head,

(including the Chief of Police), to subordinates, who are liable for those responsibilities as they

were delegated to them.

344.     The Chief of Police governs the Police Department independently, and is not accountable to any other City officer or department.

345.     The only situation that requires or allows for input by the City Council if additional funding was needed.

346.     The only action that can be taken affecting the Chief of Police is that the City Manager has the authority to hire and fire him or her.

347.     The Chief of Police establishes the City's Policies for their Department, with the authority to change written policies of that department including the command structure of the department.  These Madisonville Police Department policies, implemented by Order of the Chief, *are the City's policies.*

348.     No other City official was involved in any police matters, not even termination of personnel.  Each Chief would author and alter the job descriptions, duties, and chain of command, including the persons to whom certain duties would be delegated, and who would assume the role of Chief in his absence or as delegated.

349.     Both former Chiefs Clendennen and Chief May confirmed that the Madisonville Police Department policy manual, and not the city handbook, governed and was used to administer the police department.

350.     The policy manual was changed by each Chief of Police upon taking over, and the Chief could freely alter and amend the policies and general orders during his administration.

351.     Each page of the Madisonville Police Department policies and procedures bears the insignia of the police department and "Madisonville Police Department" at the bottom.

352.     When Chief May took over, he changed the command structure to remove lieutenants, thereby increasing the power of Covington.  The Police Department's Policies under

Chief May were formulated by Covington, who was told to adapt Chief May's policies as chief of

police for the School District to apply to the Police Department.

353.    Chief May's policies included the Madisonville Police, Department, Standard

Operational Procedure #0003, which  states:

> II. POLICY
> The **Madisonville Police Department** has adopted the standards set forth in the
> standards Manual of the Law Enforcement Agency Accreditation Program and
> Incorporated these  Standards into the General Order format.
>> All directives affecting agency policy, rules, and procedures shall be implemented
>> in writing, and disseminated to all affected personnel within the Department.
>> **These directives will govern the daily operations of the Madisonville Police
>> Department."**

354.    The Police Department Policies, Standard Operating Procedures, General Orders,

are implemented simply "by Order of the Chief of Police."

## V. CAUSES OF ACTION

**A.  Jeffery Covington, Personally, for Violation of Plaintiff's Fourth and Fourteenth
Amendment Rights, and Conspiracy to Deprive Plaintiff of her Constitutional Rights.
Pursuant to 42 U.S.C. §1983.**

355.    Plaintiff hereby incorporates by reference the preceding paragraphs contained.

356.    Defendant Jeffery Covington, while acting under the color of state law as an

officer of the Madisonville Police Department, and by the misuse of power possessed by virtue

of state law, intentionally and with malice, deprived the Plaintiff of her right to be free from

unlawful seizure as guaranteed by the Fourth Amendment to the Constitution of the United

States of America by conspiring and then having illegal drugs planted on the Plaintiff which in

turn lead to the arrest of the Plaintiff by an agent or agents of law enforcement.

357.    The arrest of the Plaintiff would not have occurred but for the planting of the

illegal drugs on the Plaintiff by the Defendant and his co-conspirators and the planting of the

drugs in this case was done intentionally, with malice and with ulterior and evil motives.

358.   Furthermore, the planting of illegal drugs on the Plaintiff by the Defendant and his coconspirators, while acting under the color of law, in order to cause the arrest and prosecution of Plaintiff who the Defendant knew was innocent of a crime, violated the Plaintiffs Fourteenth Amendment right to due process of the law prior to the Plaintiffs being deprived of her liberty.

359.   Defendant knowingly presented fabricated evidence and false testimony to cause the wrongful arrest of Plaintiff as well as the removal of her children from Plaintiff's custody and care.

360.   Defendant's actions taken under color of state law and by misuse of power possessed by virtue of state law, deprived Plaintiff of her right as a parent to the care, custody, control, and management of her children is well established. The most essential and basic aspect of familial privacy is the right of the family to remain together without the coercive interference of the awesome power of the government.

361.   By conspiring and having illegal drugs planted on the Plaintiff, Defendant Covington caused the Plaintiff to suffer damages including severe emotional distress and psychological repercussions including post traumatic stress symptoms; and unusual punishment and caused the Plaintiff to be forced to spend a significant amount of money on attorney's fees for both her criminal defense as well as representation in the suit involving the removal of her children.

**B.     Jeffery Covington, Personally, Supervisory Liability under 42 U.S.C. §1983 for Violation of Plaintiff's Fourth and Fourteenth Amendment Rights, and Conspiracy to Deprive Plaintiff of her Constitutional Rights**

362.   Plaintiff hereby incorporates by reference the preceding paragraphs contained within this amended complaint.

363.    Defendant Covington as a Sergeant with the Madisonville Police Department and acting in his supervisory capacity under color of state law, and while using his supervisory authority, knowingly and intentionally acted to deprive Plaintiff of her constitutional rights and al rights to be free from unreasonable search and seizure, to be free from arrest and prosecution in the absence of personnel guilt, to her life, liberty and property, without due process of law.

364.    Defendant Covington as a Sergeant with the Madisonville Police Department and acting in his supervisory capacity under color of state law, and while using his supervisory authority, knowingly and intentionally acted to deprive Plaintiff of her constitutional right as a parent to the care, custody, control, and management of her children is well established. The most essential and basic aspect of familial privacy is the right of the family to remain together without the coercive interference of the awesome power of the government

**C. Justin Barham, Personally for Violations of Plaintiff's Fourth and Fourteenth Amendment Rights, and Conspiracy to Deprive Plaintiff of her Constitutional Rights. Pursuant to 42 U.S.C. §1983.**

365.    Plaintiff hereby incorporates by reference the preceding paragraphs contained within the Plaintiffs Original Complaint.

366.    Defendant Justin Barham, while acting under the color of state law as an officer of the Madisonville Police Department, intentionally and with malice, deprived the Plaintiff of her right to be free from unlawful seizure as guaranteed by the Fourth Amendment to the Constitution of the United States of America by conspiring and then having illegal drugs planted on Plaintiff by agents of law enforcement, which in turn lead to the arrest of the Plaintiff.

367.    The arrest of the Plaintiff would not have occurred but for the planting of the illegal drugs on the Plaintiff by the Defendant and his co-conspirators and the planting of the drugs in this case was done intentionally, with malice and with ulterior and evil motives.

368.   Furthermore, the planting of illegal drugs on the Plaintiff by the Defendant and his coconspirators, while acting under the color of law, in order to cause the arrest and prosecution of Plaintiff who the Defendant knew was innocent of a crime, violated the Plaintiffs Fourteenth Amendment right to due process of the law prior to the Plaintiffs being deprived of her liberty.

369.   Defendant knowingly presented fabricated evidence and false testimony to cause the wrongful arrest of Plaintiff as well as the removal of her children.

370.   Defendant's actions taken under color of state law and by misuse of power possessed by virtue of state law, deprived Plaintiff of her right as a parent to the care, custody, control, and management of her children is well established. The most essential and basic aspect of familial privacy is the right of the family to remain together without the coercive interference of the awesome power of the government

371.   Defendant Barham, while acting under color of state law as a lead investigator for the Madison County District Attorney's Office, directly took actions to cause the arrest and seizure of Plaintiff; directly acted to interfere with the exoneration of Plaintiff and the investigation of law enforcement.

372.   Defendant Barham continued his actions to violate the Plaintiff's civil rights under the color of law of the Madison County District Attorney's Office, in that he was working for the very office that was attempting to prosecute the Plaintiff and continued in the conspiracy to have the Plaintiff prosecuted and her children ultimately removed from her, and to secure the conviction of Plaintiff on fabricated evidence and false information, all while knowing she was

373.   Furthermore, Defendant Barham, while acting as an investigator for the Madison County District Attorney's Office, proceeded in a manner and participated in activities related to

the prosecution of the Plaintiff, without ever informing the District Attorney's Office of the acts undertaken on the part of the Defendants.

374.    Defendant's constitutional violations caused the Plaintiff to suffer damages including severe emotional distress and psychological repercussions including post traumatic stress symptoms; and unusual punishment and caused the Plaintiff to be forced to spend a significant amount of money on attorney's fees for both her criminal defense as well as representation in the suit involving the removal of her children.

**C.    Jeremy Kidd**

**i.    Personally, for Violations of Plaintiff's Fourth and Fourteenth Amendment Rights, and Conspiracy to Deprive Plaintiff of her Constitutional Rights. Pursuant to 42 U.S.C. §1983.**

375.    Plaintiff hereby incorporates by reference the preceding paragraphs contained within the Plaintiffs Original Complaint.

376.    Defendant Jeremy Kidd, while acting under the color of state law in concert with and as an agent for officers of the Madisonville Police Department, intentionally and with malice, deprived the Plaintiff of her right to be free from unlawful seizure as guaranteed by the Fourth Amendment to the Constitution of the United States of America by planting illegal drugs on the Plaintiff's vehicle in order to cause her arrest and prosecution, knowing that Plaintiff was innocent of any crime.   Defendant Kid deprived Plaintiff of her right to liberty knowing that Plaintiff

377.    Defendant's actions taken under color of state law and by misuse of power possessed by virtue of state law, deprived Plaintiff of her right as a parent to the care, custody, control, and management of her children is well established. The most essential and basic aspect of familial privacy is the right of the family to remain together.

378.    Defendant Kidd as an agent of the Madisonville Police Department conspired to deprive Plaintiff of her rights and to cause the arrest of the Plaintiff and removal of her children.

379.    Defendant's constitutional violations caused the Plaintiff to suffer damages including severe emotional distress and psychological repercussions including post traumatic stress symptoms; and unusual punishment and caused the Plaintiff to be forced to spend a significant amount of money on attorney's fees for both her criminal defense as well as representation in the suit involving the removal of her children.

**ii. State Law Claim for Malicious Prosecution**

380.    Plaintiff hereby incorporates by reference the preceding paragraphs contained within this amended complaint.

381.    Defendant Jeremy Kidd acted in an intentional manner and with malice to initiate a criminal prosecution against the Plaintiff and a criminal prosecution was subsequently commenced.

382.    The prosecution was without merit as the drugs providing the basis of the prosecution were planted on the Plaintiff by Defendant Kidd in order to further the conspiracy of Defendants to cause Plaintiff's arrest and prosecution in the absence of personal guilt.

383.    The prosecution was terminated in favor of the Plaintiff as the Plaintiff was innocent of the charges of drug possession.

384.    Defendant Jeremy Kidd did not have probable cause to initiate the prosecution, but rather planted the drugs at issue on the Plaintiff and the actions of Defendant Kidd resulted in damages being suffered by the Plaintiff.

**iii. State Law Claim for False Imprisonment**

385.    Plaintiff hereby incorporates by reference the preceding paragraphs contained

within the Plaintiffs Original Complaint.

386.    The acts undertaken by Defendant Kidd and his involvement and participation in the conspiracy to have drugs planted on the Plaintiff were intentionally designed to cause the arrest and detention of Plaintiff.

387.    The arrest and detention of Plaintiff were without her consent.

388.    The arrest and detention of Plaintiff were without lawful authority as the drugs at issue and providing the basis for the arrest and detention had been intentionally and unlawfully planted by Defendant Kidd and other Defendants in this case.

389.    The actions on the part of Defendant Kidd caused the Plaintiff to suffer damages in this case.

### iv.  State Law Claim for Assault

390.    Plaintiff hereby incorporates by reference the preceding paragraphs contained within the Plaintiffs Original Complaint.

391.    Defendant Kidd, while conspiring with the other Defendants in this case, acted with the intent to have the Plaintiff set up and arrested for possessing drugs that Defendant Kidd had planted underneath the Plaintiff's vehicle.

392.    By way of Defendant Kidd's actions, the Plaintiff was arrested by Trooper Carl Clary, without Plaintiff's consent, and the acts of being handcuffed, placed into custody and booked into the Madison County Jail caused bodily injury to the Plaintiff.

### v.  State Law Claim for Intentional Infliction of Emotional Distress

393.    Plaintiff hereby incorporates by reference the preceding paragraphs contained within this amended complaint.

394.    The acts of Defendant Kidd complained of in this case were undertaken

intentionally and were designed to cause the Plaintiff severe emotional distress.

395.    The acts of Defendant Kidd, along with the other Defendants in this case, caused the Plaintiff to suffer severe emotional distress and the conduct of Defendant Kidd, as well as the conduct of the other Defendants in this case, was extreme and outrageous.

396.    Plaintiff was nine (9) months pregnant at the time of her arrest and at the time her two (2) of her young children were removed from her care and given to her ex-husband who had conspired to cause the arrest of Plaintiff in the absence of personal guilt.

397.    Defendant Kidd's conduct was the proximate cause of the Plaintiffs severe emotional distress.

**D. The City of Madisonville, Texas**

398.    Plaintiff hereby incorporates by reference the preceding paragraphs contained within this complaint.

399.    The Chief of Police as a final policy maker for the City of Madisonville: (1) had actual or constructive knowledge of the illegal conspiracy, search and seizure and false arrest and detention, and unlawful practices of his officers, and (2) the City's policies or customs, or persistent widespread practice of failure to supervise, train, screen, monitor, or impose any basic procedures for the operations; and (3) was specifically alerted to the violations of Plaintiff's rights but consciously disregarded and ratified the violations; (4) The Chiefs of Police knew or should have known of the violations of Plaintiff's constitutiknal rights and/or the conspiracy to deprive Plaintiff's constitutional rights, and assisted or condoned or covered up the unlawful actions of its officers and enabled the continued deprivation of rights.

400.    By City policy, two sergeants, one chief, and patrol deputies comprise the Madisonville Police Department. Final policy-making authority was delegated by the Chief to

Defendant Covington with respect to confidential informants and the supervision of all of the officers of the Police Department; Covington was given free reign and acted as de facto chief and acted to directly deprive Plaintiff of her constitutional rights and conspired to deprive Plaintiff of her constitutional rights.

### i  Failure to institute Adequate Procedures; Failure to Adequately Supervise and Negligence in Hiring

401.    The City of Madisonville, Texas has maintained a practice of failing to properly supervise its officers. The City of Madisonville has essentially allowed its officers to police themselves.

402.    This policy and practice, and its failure to provide for the supervision of its officers is demonstrated by the fact that roughly 60% of the officers of the Madisonville Police Department were fired or resigned in a six-month period.  This policy and procedure adopted by the police department provided for the environment that allowed Defendants Covington and Barham to violate the civil rights of the Plaintiff in this case.  The long list of misdeeds and criminal acts for which Madisonville Police Officers have been charged just within one year 0-2011 is beyond any ordinary oversight or "officer who slipped through the cracks."

403.    Furthermore, the City of Madisonville failed to look into the background of Defendant Covington or they would have found his termination from Iraq to be based on illegal activity involving narcotics, which would have foreclosed any career in law enforcement.

404.    The City failed to adhere to statutory mandated rules for the screening of officers and hired an unlicensed, uncertified, illegally acting police officer by submission of misrepresentations to the state regulatory agency iin order to allow avoid prohibitions and screening specifically designed to screen officers that will abuse civil rights.

405.    The City failed to correct or notify TCOLE or terminate Covington, and instead promoted an untrained, uncertified rogue supervisor to handle the supervision of all the officers.

406.    This failure on the part of the City of Madisonville and the Madisonville Police Department is the proximate and/or direct cause of the injuries suffered by Plaintiff as they relate to Defendants Covington and barham

407.    Sergeant Covington and Officer Barham were not subject to review.  They were allowed to run the drug unit and the CIs without any inquiry into their activities and were not subject to review by any other city official.  Covington and Barham were only required to run CI operations through the Chief if they needed approval to pay the CIs, which they never needed.

**ii.  Knowledge/Participation/Deliberate Indifference & Ratification by Final Policy Maker**

408.    Both Chiefs of Police, final policy maker for the City, knew of the conspiracy and efforts to violate Plaintiff's civil rights but intentionally disregarded, ratified, protected, and directly allowed the deprivation of those rights.

409.    The Chiefs of Police, as the final policymaker with respect to the police force of Madisonville, was aware of the activities and created an atmosphere that fostered gross and unchecked misconduct.  The Chief of Police was aware of the specific actions complained of herein, covered up, ratified them, or turned a blind eye, allowing them to continue.

410.    The Chiefs of Police was specifically informed that Covington and Barham were going around looking for someone to plant drugs in Plaintiff's car in order to frame her.  The Chief brushed this information aside and ignored it.  Former Chief of Police Gary Clendennen was also aware of Defendant Covington's ongoing dispute with his ex-wife over custody and/or his child support obligations.  Clendennen knew or should have known of the efforts of Defendant sergeant Covington to set Plaintiff up to be arrested and prosecuted because of the

dispute.   Everybody at the police department (if not the entire community) knew about Defendant Covington's battle with his ex-wife, and his efforts to conspire to have Plaintiff wrongfully arrested and prosecuted.  Moreover, other officers reported the actions of Defendant Covington and/or Barham to the Chief.  The Chief himself ordered the escorting and use of the police force as a private security and intimidation team for Covington's personal disputes.

411.   Like his predecessor, Chief May allowed Defendant Covington to operate and run the police department with little or no supervision, allowed or delegated to Covington the authority to manage the confidential informants without any supervision or oversight, or even standard operating procedures. Defendant Covington operated autonomously and was in charge of the supervision of confidential informants as well as the officers under his supervision. Defendant Covington was a sergeant, chief narcotics officer, and was not required to report to anyone at least with regards to CIs and various investigative activities, was the supervisor for most if not all of the police officers, and was allowed to make policy with respect to CIs and investigations using CIs.

## VI. DAMAGES

412.   As a result of the above-noted violations and causes of actions, the Plaintiff incurred significant and substantial damages. The Plaintiff suffered pain during the arrest and subsequent jailing of the Plaintiff, and the Plaintiff suffered extreme emotional distress and mental anguish by way of having her two (2) young children removed from her and by was of the Plaintiff being unjustly arrested and jailed for a crime she did not commit.  Plaintiff has suffered continuing psychological injury including post traumatic stress by having an entire police force conspire against her.  The Plaintiff was required to hire attorneys to represent her, both civilly and criminally. The Plaintiff is entitled to costs of court, prejudgment interest on any

damages suffered by the Plaintiff, and exemplary damages from the Defendants as the Defendants in this case acted with malice, anger and evil motives.  Plaintiff seeks damages in this case in the amount of $5,000,000.00.

## PRAYER

412.    Plaintiff respectfully prays for the following relief:

a.  Judgment against Defendants for damages sustained by Plaintiff as alleged herein, including actual damages, special damages, compensatory damages, emotional damages, punitive damages, attorney's fees, costs, interest, and any other damages allowed by law;

b.   Attorney's fees, costs, and expenses;

c.  Injunctive and declaratory relief, including, an order that Defendants cease their violations of Plaintiff's rights and that Defendant Police Department implement constitutionally sound policies as mandated by law;

413.    Plaintiff prays that, upon trial before a jury of her peers, she be granted the relief set forth herein, as well as all other relief to which she may be entitled under law.

**Date:**   October 5, 2015.

Respectfully submitted,

/s/ *J. Paxton Adams*
J. Paxton Adams
State Bar No. 24042459
Southern District No. 628065
*Attorney in Charge*
J. PAXTON ADAMS
ATTORNEY AT LAW
1113 Twelfth Street
Huntsville, Texas 77340
Tel: (936) 291-9900
Fax: (936) 291-9903
huntsvilleatty@att.net

*Of Counsel:*

Laurence Watts
State Bar No. 20981000
Federal I.D. 7092
Melissa Azadeh
State Bar No. 24064851
WATTS & COMPANY LAWYERS, LTD.
P.O. Box 2214
Missouri City, Texas 77459
Tel: (281) 431-1500
Fax: (877) 797-4055
wattstrial@gmail.com

ATTORNEYS FOR PLAINTIFF
LAURA COVINGTON

**JURY DEMANDED**

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of October 2015, a true and correct copy of the foregoing document was delivered to all opposing counsel(s) by electronic filing of same in accordance with the District's ECF service rules; and will be delivered to the parties proceeding *pro se* on by certified mail, return receipt requested and/or UPS, to:

William S. Helfand
Norman R. Giles
Chamberlain, Hrdlicka, White, Williams & Aughtry
1200 Smith Street, Suite 1400
Houston, Texas  77002

Jeffery Covington, *Pro Se*
4639 Davidson Lane
Madisonville, Texas  77864

Justin Barham, *Pro Se*
528 8th Street
Dickinson, Texas  77539
jbarham210@yahoo.com

/s/ *J. Paxton Adams*
J. Paxton Adams