United States District Court
Southern District of Texas
**ENTERED**
June 03, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA COVINGTON, | § | |
| *Plaintiff*, | § § § | |
| VS. | § § | CIVIL ACTION NO. 4:13-CV-03300 |
| CITY OF MADISONVILLE, TEXAS, | § § § | |
| *Defendant*. | § | |

## ORDER

Before the Court is a Motion for Summary Judgment filed by Defendant City of Madisonville, Texas ("Defendant" or "the City") (Doc. No. 201). Plaintiff Laura Covington ("Plaintiff") filed a response in opposition (Doc. No. 231), and the City replied thereto (Doc. No. 236). After careful consideration, the Court grants Defendant's Motion.

### I. Background[1]

A. Procedural History

In November 2013, Plaintiff filed suit against individual defendants and the City, seeking to recover damages under 42 U.S.C. § 1983, arising from her unlawful arrest and consequent temporary loss of child custody. (Doc. No. 1). Plaintiff was arrested and charged with a drug offense as a result of her ex-husband, Jeffrey Covington ("Jeffrey"), who at the time was an officer with the Madisonville Police Department ("MPD"), having had methamphetamine planted underneath her vehicle. The charges against Plaintiff were eventually dismissed over a year later, and she regained custody of the children. Following a lengthy investigation, Jeffrey and another former MPD officer, Justin Barham, were arrested. Jeffrey was indicted. A jury found Jeffrey

---

[1] This background section is largely adapted from the background set forth in the Fifth Circuit's panel opinion in *Covington v. City of Madisonville*, 812 F. App'x 219, 220–22 (5th Cir. 2020) (per curiam). (Doc. No. 183, at 2–5).

guilty of retaliation for which he received a probated sentence of five years' confinement in the state prison, was required to surrender his peace officer license, and served thirty days' confinement in county jail.

In the instant civil matter, Plaintiff prevailed at trial on her claims against Jeffrey and other individual defendants and was awarded monetary damages. Prior to trial, however, this court's predecessor granted two Rule 12(b)(6) motions to dismiss filed by the City. The motions argued, inter alia, that Plaintiff's allegations failed to satisfy the requirement of § 1983 liability that a policymaker have knowledge of a policy that caused a deprivation of a constitutional right. (Doc. Nos. 57, 103). The first motion was granted, but Plaintiff was allowed to amend her complaint. (Doc. No. 91, at 45). The court subsequently granted the second motion with prejudice, however, reasoning that Plaintiff had already had an opportunity to amend, and that any additional amendment would be futile. (Doc. No. 110, at 21). Thereafter, Plaintiff filed a motion for reconsideration, contending the court had not "specifically addressed" certain "critical allegations" in the Second Amended Complaint "establishing municipal liability." (Doc. No. 111, at 1). The court denied the motion, stating that it had thoroughly considered the parties' arguments and relevant caselaw, and Plaintiff's motion did not identify any manifest error or law or fact. (Doc. No. 118, at 2).

Plaintiff appealed the court's dismissal of her claims against the City. (Doc. No. 164). On appeal, the three-judge panel affirmed in part, reversed in part, and remanded, holding that the court erred in dismissing Plaintiff's "single incident" failure-to-supervise claim and ratification claim asserted against the City pursuant to 42 U.S.C. § 1983. (Doc. No. 183, at 17).

On remand, the case was reassigned to the undersigned judge. The City has filed a motion for summary judgment on Plaintiff's two remaining § 1983 claims. (Doc. No. 201). Plaintiff filed a response in opposition (Doc. No. 231), and the City replied thereto (Doc. No. 236).

B. Factual Background

According to the Second Amended Complaint, Plaintiff and Jeffrey married in 2003, divorced in 2004, married a second time in 2007, and divorced again in 2010. (Doc. No. 98, at 3–6). Prior to their first marriage, Jeffrey was an officer of the MPD, which employs a force of six to eight persons for the City's population of approximately 4,500. (*Id.* at 3, 55). Between 2006 and 2009, however, Jeffrey was employed by DynCorp International, a private corporation headquartered in Dubai which served as a private security contractor to the United States Army's forces in Iraq. (*Id.* at 33). Jeffrey worked as a police advisor in Iraq. (*Id.*). In 2009, however, finding Jeffrey had violated United States Policies and Codes of Conduct (by attempting to improperly purchase Viagra from an Iraqi vendor), DynCorp terminated his employment. (*Id.* at 34).

Upon Jeffrey's return to Madisonville, Chief of Police Clendennen ("Chief Clendennen")[2] re-hired him and, in May 2010, promoted him to K-9 officer. (*Id.* at 35, 40). In July 2010, Jeffrey became a Patrol Sergeant. (*Id.* at 40, 44). In that role, he supervised all Patrol Officers and was in charge of the MPD's confidential informants. (*Id.* at 44).

During this period, Plaintiff and Jeffrey's relationship can fairly be described as troubled and acrimonious. The Second Amended Complaint describes a 2009 incident involving Plaintiff raising a baseball bat "as if to hi[t] him but not hit him," when, according to Plaintiff, Jeffrey "'snapped,' grabbed [her] throat, threw her on the couch, [and] put his knee in [her] chest while choking her." (*Id.* at 4). The Madisonville police were called and responded. (*Id.* at 4–5).

---

[2] Chief Clendennen was replaced by Claude W. "Chuck" May ("Chief May") on September 19, 2011. (Doc. No. 98, at 13–14); *see* (Doc. No. 201, Ex. 2, at 1).

3

Apparently because the incident involved an MPD officer, a Texas Ranger was asked to investigate the matter. (*Id.* at 5). Eventually, prosecution was declined by the district attorney. (*Id.* at 6). Thereafter, Chief Clendennen required another officer to be present whenever Plaintiff and Jeffrey were together. (*Id.* at 18). Later, in 2010, Child Protective Services and the Texas Rangers investigated Jeffrey for allegedly improperly disciplining one of the children. (*Id.* at 7–8). The case was presented to a grand jury, but no charges were brought. (*Id.* at 8).

The incident concerning the planted methamphetamine occurred after the Covingtons' second divorce. The methamphetamine was discovered in a magnetic key holder hidden on the underside of Plaintiff's vehicle on November 9, 2011, when a Texas state trooper, Carl Clary, stopped her for speeding and conducted a consensual search of her vehicle. (*Id.* at 20). Although Trooper Clary did not initially intend to search the vehicle, he did so when Jeffrey, upon hearing Plaintiff's name over the police radio, called Trooper Clary's cell phone. (*Id.*). Jeffrey told Trooper Clary that Plaintiff had tried to run over Jeffrey's current wife that morning and had drugs hidden in a magnetic key holder hidden under her vehicle. (*Id.*). When Trooper Clary found the methamphetamine, Plaintiff denied that that it belonged to her, and accused Jeffrey of planting the drugs, stating that she knew "something like this was going to happen." (*Id.* at 20, 22). Plaintiff was arrested, booked into jail on felony drug charges, and lost custody of her two young children to Jeffrey. (*Id.* at 21).

Suspecting that Plaintiff's claims that she was set up were likely correct, Trooper Clary reported the incident to the district attorney and another Texas Ranger for investigation. (*Id.* at 23). Ultimately, the charges against Plaintiff were dropped, the children were returned to Plaintiff's custody, and Jeffrey was eventually indicted, tried, and convicted. (*Id.* at 23, 52, 54).

4

In this Court, Plaintiff alleges that, after she and Jeffrey divorced in 2010 and he re-married, he sought to have her arrested in an effort to gain custody of their children. (*Id.* at 6).[3] According to the Second Amended Complaint, Jeffrey frequently complained about his ongoing custody battles with Plaintiff to other MPD officers and urged them to try to "find any reason to stop her and arrest her" in order to help his custody case. (*Id.* at 18). Eventually, Jeffrey sought to recruit one of the police department's CI's ("confidential informants") to plant illegal drugs in/on her vehicle. (*Id.* at 9–10). Plaintiff alleges that drugs were planted back in March 2011—but the novice officer searching her vehicle the first time, in August 2011, failed to find them. (*Id.* at 10, 15–16, 20). To avoid such failure the second time, Jeffrey allegedly told Trooper Clary—two months before the November 2011 traffic stop—exactly how and where the drugs were hidden underneath Plaintiff's vehicle. (*Id.* at 20–21). After drugs were found in her vehicle on November 9, 2011, Jeffrey filed an emergency ex parte petition seeking custody of the children. (*Id.* at 21). He succeeded on this motion. (*Id.*). Ultimately, the children were returned to Plaintiff's custody, and on November 8, 2012, Jeffrey voluntarily relinquished his parental rights to the children. (*Id.* at 23).

## II. Summary Judgment Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

---

[3] The Second Amended Complaint alleges that Jeffrey's second wife, April, demanded that he "get rid of Laura, even if that meant getting rid of his children with Laura, or April was going to leave him." (*Id.* at 8). Thereafter, "April and Jeffrey set out devising a plan to get rid of Laura so as to obtain custody of Laura's children." (*Id.*).

5

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25.

The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

### III.   Discussion

As stated above, the two remaining claims in this case both arise under § 1983. The first claim is a "single incident" claim, focusing on Chiefs Clendennen and May's failure to supervise Jeffrey's misconduct relative to Plaintiff's November 2011 false arrest. The second claim is premised on Chief May's alleged ratification of Jeffrey's unlawful actions.[4]

Title 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

---

[4] In addition to proving the basic elements to establish municipal liability, in order to prevail on her failure-to-supervise claim Plaintiff must prove that the policy was established with the "requisite official knowledge"—i.e., deliberate indifference. *Covington v. City of Madisonville*, 812 F. App'x 219, 225 (5th Cir. 2020) (per curiam). For deliberate indifference to be based on a single incident, "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy." *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 373 (5th Cir. 2003)).

In order for her to prevail on her ratification claim, Plaintiff must establish that "a policymaker knowingly approved a subordinate's actions and the improper basis for those actions." *Covington*, 812 F. App'x at 225 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 603 n.9 (5th Cir. 2001)).

6

the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

A municipality or other local government may be liable under § 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). Nevertheless, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 471 (1986) (emphasis in original) (citing *Monell*, 436 U.S. at 665–83). They are not vicariously liable under § 1983 for their employees' actions. *Id.* at 478.

Municipal liability under § 1983 requires three elements: (1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). Regardless of which theory Plaintiff pursues, the law requires satisfaction of these elements "to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Id.*

The existence of a policy is usually shown through evidence of an actual policy, regulation, or decision that is officially adopted by a policymaker or through evidence of a persistent, widespread practice of city officials or employees. *See Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003). Nonetheless, two alternate methods of fulfilling the policy requirement exist in the caselaw, both of which are at play here. First, "a single decision by a policy maker may, under certain circumstances, constitute a policy for which the [City] may be liable." *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000). This "single incident exception" is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker. *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) (per curiam) (citing *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005)). Second, "a policymaker's ratification or defense of his

subordinate's actions" may establish a policy chargeable to the municipality. *World Wide St. Preachers F'ship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009). The theory of ratification has been limited to "extreme factual situations." *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009). Both approaches require a policy instituted by a policymaker.

The City has moved for summary judgment on both of Plaintiff's remaining claims—the "single incident" failure-to-supervise claim and the ratification claim—on the basis that she has failed to meet her burden on the first element of § 1983 municipal liability, namely, that Chiefs Clendennen and May were policymakers. To satisfy this element, Plaintiff must adequately prove the Madisonville Chief of Police has "final policymaking authority." *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "[W]hether an official has been delegated final policymaking authority is a question of law for the judge, not of fact for the jury." *Gros v. City of Grand Prairie*, 181 F.3d 613, 617 (5th Cir. 1999).

State and local law controls the question whether a particular official has final policymaking authority. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). "A 'policymaker' must be one who takes the place of a governing body in a designated area of city administration." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (citing *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984) (en banc)). "City policymakers not only govern conduct; they decide the goals for a particular city function and devise the means of achieving those goals." *Bennett*, 728 F.2d at 769. "Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance." *Id.*

This Court must also consider "the difference between final decisionmaking authority and final policymaking authority, a distinction that this circuit recognized as fundamental." *Bolton*, 541 F.3d at 548–49 (citing *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1247 (5th Cir. 1993)). "[D]iscretion to exercise a particular function does not necessarily entail final policymaking authority over that function." *Id.* at 549. Instead, as the Supreme Court has explained,

> municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered. *The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy* respecting such activity before the municipality can be held liable.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986) (plurality opinion) (emphasis added) (footnotes and citation omitted); *see also Jett*, 7 F.3d at 1246 (distinguishing between "those having mere *decisionmaking* authority and those having *policymaking* authority").

"A municipality can be held liable only when it delegates policymaking authority, not when it delegates decisionmaking authority." *Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019) (emphasis removed). Policymaking authority may be delegated in one of two ways. First, the governing body may delegate policymaking authority "by an express statement, by a job description or by other formal action." *Bennett*, 728 F.2d at 769. Second, "it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role." *Id.* In either case, "[t]he governing body must expressly or impliedly acknowledge that the agent or board acts in lieu of the governing body to set goals and to structure and design the area of the delegated responsibility, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent or board." *Id.*

Here, the parties agree that the Madisonville City Council is the relevant governing body. (Doc. No. 231, at 27–28) (Doc. No. 236, at 6). That, however, is where the agreement ends.

9

Plaintiff contends that Chiefs of Police Clendennen and May were final policymakers for the City. (Doc. No. 231, at 25). The City disagrees. Thus, the pivotal question is "whether the city council had expressly or impliedly acknowledged that the [Chief of Police] could act in their stead to set goals and to structure and design the activities of the [Madisonville] Police Department." *See Webster*, 735 F.2d at 841.

To answer this question, the Court must take into account state law. *See Jett*, 491 U.S. at 737. The relevant sources of state law are "state and local positive law, as well as 'custom or usage' having the force of law." *Gros*, 181 F.3d at 616 (quoting *Jett*, 491 U.S. at 737). To support its position that the Madisonville Chief of Police was not a final policymaker, the City contends that the City Manager and City Council have the relevant authority over the police department. (Doc. No. 201, at 12–15). The City stresses that under Texas law, "[t]he governing body of a Type A general-law municipality [such as Madisonville[5]] may establish and *regulate* a municipal police force." TEX. LOC. GOV'T CODE § 25.029 (emphasis added). Moreover, the City points to local ordinances illustrating the subordinate relationship of the police chief to the City Council. *See* MADISONVILLE, TEX., CODE OF ORDINANCES § 2-98(4) (2014) (identifying as duty of city manager "[t]o exercise supervision and control over all departments created by the city council"); *id.* § 2-129 (vesting in city manager power to appoint chief of police); *id.* § 2-132 (providing that the city manager directs and controls chief of police's term of office). In the City's view, these sources of law demonstrate that the relevant policymaker was either the City Council or the City Manager, never the chief of police. (Doc. No. 201, at 14). Moreover, the City contends, the minutes of the City Council demonstrate the council's exercise of its authority to act as exclusive policymaker for the city's law enforcement and personnel policies. (*Id.* at 14–15).

---

[5] The City contends, and Plaintiff does not dispute, that Madisonville is a Type A general-law municipality. *See* (Doc. No. 201, at 14).

To support her position that the Madisonville Chief of Police possessed final policymaking authority, Plaintiff contends that Chiefs Clendennen and May were each, during their respective tenures, the sole official responsible for internal police policy. Plaintiff fails to cite any official document by which the City Council delegated any of its policymaking authority to the chief of police. She does, however, adduce the testimony of several present or former MPD officers, including:

- former MPD officer Justin Barham's declaration testimony that the police chiefs "could and would create unwritten policies, which did not have to be reviewed or approved by the City Manager, or City Council for the City," (Doc. No. 231, Ex. 1, at 3);
- former MPD officer David Sims's deposition testimony that the chiefs had the "ultimate authority" to interpret and implement the policies and the police department, (Doc. No. 231, Ex. 5, at 13);
- Chief Clendennen's deposition testimony that the police chief "could change the whole policy manual" (Doc. No. 231, Ex. 3, at 19); and
- Chief May's deposition testimony asserting, "My directives are city policy," (Doc. No. 231, Ex. 6, at 8).

Plaintiff also points to internal documents of the MPD. For example, General Order 100-05 of the MPD gives the chief of police "responsib[ility] for the administration and management of the entire police organization." (Doc. No. 231, Ex. 15, at 14, 174). The Policy Manual of the MPD reserved to the chief of police the "right to modify or rescind any of the provisions of this policy manual." (*Id.* at 3). Another internal document provided that "[n]o written directive establishing departmental policy or procedure shall be issued except under the signature of the Chief of Police." (*Id.* at 2).

In sum, Plaintiff asserts that Chiefs Clendennen and May had plenary authority over police policy during their respective tenures, while the City maintains that the police chiefs lacked final policymaking authority. If this were a question of fact, the Court would submit this question to the jury, as both sides have evidentiary support. It is, however, a question of law that the Court must

decide. *See Gros*, 181 F.3d at 617. The Court finds, on balance, while Chiefs Clendennen and May possessed some level of discretionary or decision-making authority, the summary judgment evidence fails to establish that the City Council expressly or impliedly delegated them policymaking authority.

While the evidence cited by Plaintiff suggests that the police chiefs at times claimed some level of authority to follow city policy or not, the fact that they did not follow the policies (or created their own unwritten policies) cannot serve as evidence of "policymaking" on behalf of the city. On the contrary, the minutes of the City Council strongly demonstrate that the Chiefs lacked final policymaking authority. For example, shortly after Chief May replaced Chief Clendennen in late 2011, the City met to "[r]eview and possibly approve" Chief May's proposed overhaul of the MPD policy manual. (Doc. No. 201, Ex. 7, at 4). In Plaintiff's view, this evinces an express delegation of policymaking authority to Chief May. (Doc. No. 231, at 28). In the Court's view, this evidence cuts just the other way. It shows that the City did not acknowledge the police chief as having the final say on police policy. His actions had to have council approval. Thus, in this case it cannot be said that "[t]here is no evidence that the City Council has ever commented authoritatively on the internal procedures of the department." *See Zarnow*, 614 F.3d at 168.

The police chief's subordinate role and lack of final policymaking authority is corroborated by Chief May's declaration:

> The Madisonville City Council closely monitored the activity of the police department, as well as other City departments. I regularly presented reports regarding police operations and activities to Council at their meetings. I was well aware that I lacked authority to act contrary to City Council policy. Likewise, I knew that the City Manager was my supervisor and that I was required to consult with and obtain the approval of the City Manager before making any substantial decision or taking substantial action regarding the police department or any police employee. I certainly did not have free reign to operate the police department untethered from supervision by the City Manager and City Council.

(Doc. No. 201, Ex. 2, at 9). Chief May's testimony suggests that the police chief was, at most, a "decisionmaker." *See Jett*, 7 F.3d at 1246–48. The police chief's orders may set the tone and direct the day-to-day police activities, but he is not an official policymaker for the City.

Absent final policymaking authority, neither the police chiefs' alleged decision not to supervise Jeffrey nor their alleged ratification of Jeffrey's unlawful conduct can qualify as official city policy. Plaintiff's § 1983 municipal liability claims therefore fail as a matter of law.

## IV.   Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 201) is **GRANTED**. All other pending motions are **DENIED** as moot.

Signed at Houston, Texas, this 2nd day of June, 2022.

Andrew S. Hanen
United States District Judge